**03 - 20459**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____



**CIV-MARTINEZ**

MAGISTRATE JUDGE DUBÉ

)
)
AMY LIU on behalf of herself and all others similarly )
situated, )
)
     Plaintiff, )
)
vs. )
)
CREDIT SUISSE FIRST BOSTON )
CORPORATION, CREDIT SUISSE FIRST )
BOSTON, INCORPORATED, CREDIT SUISSE )
FIRST BOSTON-USA, CREDIT SUISSE FIRST )
BOSTON, CREDIT SUISSE GROUP, FRANK )
QUATTRONE, GEORGE BOUTROS, WILLIAM )
BRADY, JOHN M. HENNESSY, ALLEN D. )
WHEAT, RICHARD THORNBURGH, CHARLES )
WARD,  DAVID A. DENUNZIO, EDWARD )   COMPLAINT—CLASS ACTION
NADEL, JOHN HODGE, JACK TEJAVANIJA, )   JURY TRIAL DEMANDED
AIRSPAN NETWORKS, INC., ERIC D. )
STONESTROM, JOSEPH J. CAFFARELLI, AT )
ROAD, INC., KRISH PANU, THOMAS C. )
HOSTER, OCCAM NETWORKS INC. (formerly )
"ACCELERATED NETWORKS, INC.") , SURESH )
NIHALANI, FREDERIC T. BOYER, AVANTGO, )
INC., RICHARD OWEN, DAVID B. COOPER, JR., )
AUTOWEB.COM, INC. (AUTOBYTEL, real party )
in interest), DEAN A. DEBIASE, SAMUEL M. )
HEDGPETH III, BSQUARE CORP., WILLIAM T. )
BAXTER, BRIAN V. TURNER, BLUE COAT )
SYSTEMS, INC. (formerly "CACHEFLOW, INC."), )
BRIAN M. NESMITH, MICHAEL J. JOHNSON, )
CLARENT CORP. (VERSO TECHNOLOGIES, )
INC., real party in interest), JERRY SHAW-YAU )
CHANG, RICHARD J. HEAPS, COMMERCE ONE, )
INC., MARK B. HOFFMAN, PETER F. PERVERE, )
CORILLIAN CORP., TED F. SPOONER, STEVEN )
SIPOWICZ, CENTILLIUM COMMUNICATIONS, )
INC., FARAJ AALAEI, JOHN W. LUHTALA, )
DIGITAL IMPACT, INC., WILLIAM C. PARK, )
DAVID OPPENHEIMER, E MACHINES, INC., )



1

STEPHEN A. DUKKER, STEVEN H. MILLER,                )
EFFICIENT NETWORKS, INC., MARK A.                    )
FLOYD, JILL S. MANNING, E.PIPHANY, INC.,             )
ROGER S. SIBONI, KEVIN J. YEAMAN, EVOLVE             )
SOFTWARE, INC., JOHN P. BANTLEMAN,                   )
DOUGLAS S. SINCLAIR, HANDSPRING, INC.,               )
DONNA L. DUBINSKY, BERNARD J. WHITNEY,               )
IMPROVENET, INC., RONALD B. COOPER,                  )
RICHARD G. REECE, INTERNAP NETWORK                   )
SERVICES CORP., ANTHONY C. NAUGHTIN,                 )
PAUL E. MCBRIDE, INFORMATICA CORP.,                  )
GAURAV S. DHILLON, CRAIG L.                          )
KLOSTERMAN, IPRINT TECHNOLOGIES, INC.                )
(formerly "IPRINT.COM"; MADETOORDER.COM,             )
INC., real party in interest), ROYAL P. FARROS,      )
JAMES P. MCCORMICK, INTRAWARE, INC.,                 )
PETER H. JACKSON, DONALD M. FREED,                   )
INTERTRUST TECHNOLOGIES CORP., VICTOR                )
SHEAR, ERWIN N. LENOWITZ, INTERWOVEN,                )
INC., MARTIN BRAUNS, DAVID M. ALLEN,                 )
LUMINENT, INC., WILLIAM R. SPIVEY, ERIC              )
BLACHNO, LANTE CORP. (SBI AND                        )
COMPANY, real party in interest), C. RUDY            )
PURYEAR, BRIAN HENRY, VA SOFTWARE                    )
CORPORATION (formerly "VA LINUX                      )
SYSTEMS"), LARRY M. AUGUSTIN, TODD B.                )
SCHULL, LIGHTSPAN PARTNERSHIP, INC.,                 )
JOHN T. KERNAN, KATHLEEN R. MCELWEE,                 )
MCDATA CORPORATION, JOHN F.                          )
MCDONNELL, DEE J. PERRY, MULTILINK                   )
TECHNOLOGY CORP., RICHARD N.                         )
NOTTENBURG, ERIC M. PILLMORE, MP3.COM                )
(VIVENDI UNIVERSAL NET USA GROUP, INC.,              )
real party in interest), MICHAEL L. ROBERTSON,       )
PAUL L. H. OUYANG, NUMERICAL                         )
TECHNOLOGIES, INC., Y. C. (BUNO) PATI,               )
RICHARD MORA, NEW FOCUS, INC., KENNETH               )
E. WESTRICK, WILLIAM L. POTTS, JR.,                  )
NOVATEL WIRELESS, INC., JOHN MAJOR,                  )
MELVIN FLOWERS, ONVIA.COM, INC., GLENN               )
S. BALLMAN, MARK T. CALVERT, ONYX                    )
SOFTWARE CORP., BRENT R. FREI, SARWAT                )
H. RAMADAN, RAZORFISH, INC. (SBI AND                 )
COMPANY, real party in interest), JEFFREY A.         )
DACHIS, SUSAN BLACK, RETEK, INC., JOHN               )

2

BUCHANAN, GREGORY A. EFFERTZ,                          )
PINNACOR, INC. (formerly "SCREAMINGMEDIA,              )
INC.")., KEVIN C. CLARK, DAVID M. OBSTLER,             )
SILICON IMAGE, INC., DAVID D. LEE, DANIEL              )
K. ATLER, SELECTICA, INC., RAJEN JASWA,                )
STEPHEN BENNION, SIMPLEX SOLUTIONS,                    )
INC. (CADENCE DESIGN SYSTEMS, INC., real               )
party in interest), PENELOPE A. HERSCHER, LUIS         )
P. BUHLER, SUPPORTSOFT, INC. (formerly                 )
"SUPPORT.COM"), RADHA R. BASU, BRIAN M.                )
BEATTIE, TANNING TECHNOLOGY CORP.,                     )
LARRY G. TANNING, HENRY F. SKELSEY,                    )
TICKETS.COM, INC., W. THOMAS GIMPLE,                   )
JOHN M. MARKOVICH, TUMBLEWEED                          )
COMMUNICATIONS CORP., JEFFREY C. SMITH,                )
JOSEPH C. CONSUL, TRITON NETWORK                       )
SYSTEMS, INC., HOWARD SPEAKS, KENNETH                  )
R. VINES, VIANT CORP. (DIVINE, INC., real party        )
in interest), ROBERT L. GETT, M. DWAYNE                )
NESMITH, VITRIA TECHNOLOGY, INC., JOMEI                )
CHANG, PAUL AUVIL, GLOBESPANVIRATA,                    )
INC. (formerly "VIRATA CORP."), CHARLES                )
COTTON, ANDRE VOUGHT,                                  )
                                                       )
      Defendants.        )
                                                       )
_____       )

      Plaintiff makes the following allegations, except as to allegations specifically pertaining

to plaintiff and her counsel, based upon the investigation undertaken by plaintiff's counsel,

which included without limitation: (a) interviews with current and former employees of Credit

Suisse First Boston Corporation; (b) reviews of research reports published by Credit Suisse First

Boston Corporation relating to the corporate issuers named herein; (c) reviews of the

prospectuses of each corporate issuer named herein; and (d) an analysis of publicly-available

news articles and reports, stock price history data, public filings, press releases and other matters

of public records, and believe that substantial evidentiary support will exist for the allegations set

forth herein  after a reasonable opportunity for discovery.

## NATURE OF ACTION

This is a class action on behalf of all purchasers of the common stock of the following issuer companies during the Class Period described herein: Accelerated Networks, Inc.; Airspan Networks, Inc.; At Road, Inc.; AvantGo, Inc.; Autoweb.com, Inc.; Bsquare Corp.; CacheFlow, Inc.; Clarent Corp.; Commerce One, Inc.; Corillian Corp.; Centillium Communications, Inc.; Digital Impact, Inc; e Machines, Inc.; Efficient Networks, Inc.; E.piphany, Inc.; Evolve Software, Inc.; Handspring Inc.; ImproveNet, Inc.; Informatica Corp.; InterNAP Network Services Corp.; iPrint.com, Inc.; Intraware, Inc.; InterTrust Technologies Corp.; Interwoven, Inc.; Luminent, Inc.; Lante Corp.; VA Linux Systems; Lightspan Partnership, Inc.; McData Corp.; MultiLink Technology Corp.; MP3.com, Inc.; Numerical Technologies, Inc.; New Focus, Inc.; Novatel Wireless, Inc.; Onvia.com, Inc.; Onyx Software Corp.; Razorfish, Inc.; Retek, Inc.; ScreamingMedia, Inc.; Silicon Image, Inc.; Selectica, Inc.; Simplex Solutions, Inc.; Support.com, Inc.; Tanning Technology Corp.; Tickets.com, Inc.; Tumbleweed Communications Corp.; Triton Network Systems, Inc.; Viant Corp.; Vitria Technology, Inc.; Virata Corp. (collectively hereinafter, the "Issuers").

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa), Section 22(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v), and 28 U.S.C. § 1367(a).

2.     This action arises under Sections 10(b) of the Exchange Act (15 U.S.C. § 78j(b) and 78(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 20(a) of the

4

Exchange Act, Sections 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77l(a)(2) and 77o),

common law respondeat superior, common law fraud, and the Florida Blue Sky Law (F.S.A. §

517.301).

3.　　　Venue is proper in this district pursuant to Section 27 of the Exchange Act, Section

22 of the Securities Act, and 28 U.S.C. § 1391(b).  At all times herein mentioned, defendant Credit

Suisse First Boston Corporation maintained an office in and transacted business in this district at

1111 Brickell Avenue, in Miami, Florida.

4.　　　In connection with the acts alleged in this complaint, the defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities

markets.

## PARTIES

### Plaintiff

5.　　　Plaintiff, personally and as successor in interest to the estate of her deceased

husband, Peter Lin, purchased Commerce One securities in the open market during the Subclass

Nine Period.

### Bank Defendants

6.　　　Defendant CREDIT SUISSE FIRST BOSTON CORPORATION ("CSFBC") is an

investment bank.  CSFBC is a corporation organized and existing under the laws of Massachusetts.

At all relevant times, CSFBC was a registered broker-dealer and member of the National

Association of Securities Dealers, Inc. ("NASD").  CSFBC was a lead underwriter for the initial

public offerings ("IPOs") completed by each of the Issuers, defined below and listed in Exhibit A

5

hereto.  At all relevant times, CSFBC had a duty to promptly disseminate truthful and accurate information with respect to the IPOs and the Issuers.

7.      CSFBC is a wholly-owned subsidiary of defendant CREDIT SUISSE FIRST BOSTON (USA), Inc. ("CSFB-USA").  CSFB-USA is a Delaware corporation.

8.      CSFB-USA is a wholly-owned subsidiary of defendant CREDIT SUISSE FIRST BOSTON, INC. ("CSFBI").  CSFBI is a Delaware corporation.

9.      CSFBI is jointly owned by the defendant Swiss Bank CREDIT SUISSE FIRST BOSTON ("CS") and the defendant Swiss holding company, CREDIT SUISSE GROUP ("CSG").  CSG, in addition to partially owning CSFBI, also wholly owns CS.  CS and CSG are Swiss business entities.

10.     On November 3, 2000, CS acquired an underwriter, Donaldson Lufkin & Jenrette Inc ("DLJ").  As a result of this acquisition, CSFBI changed its organizational structure, and CSFBC, one of CSFBI's (and CS's) principal U.S. registered broker-dealers, became a subsidiary of DLJ, and DLJ changed its name to Credit Suisse First Boston (USA), Inc. ("CSFB-USA").

11.     Defendant JOHN M. HENNESSY was a member of the Board of Directors of CSG in 1998, 1999, 2000, and from January 2001 through June of 2001.  He was also simultaneously Chairman of Private Equity of CS during all or part of the same period of time.

12.     Defendant ALLEN D. WHEAT was a member of the Executive Board of CSG in 1998, 1999, 2000, and part of 2001.  He was also simultaneously Chairman of the Executive Board of CS, as well as Chief Executive Officer of CS during all or part of the same period of time.

13.     Defendant RICHARD THORNBURGH is a member of the Board of Directors of CSG and previously occupied this position in 1998, 1999, 2000, and 2001.  He also served as Chief Financial Officer and/or Chief Risk Officer for CSG throughout the same period of time, and

6

presently also serves as Chief Risk Officer.  In addition to his duties with CSG, he was also Vice

Chairman of the Executive Board of CS from April 1, 1999 through 2000, and some or all of 2001.

Simultaneously, for all or some part of that time, he also served as Chief Financial Officer for CS.

14.     Defendant CHARLES WARD was a member of the Executive Board of CS in 1998,

1999, 2000, and some or all of 2001.  He was also simultaneously Co-Head of Investment Banking

and Private Equity for CS during some or all of the same period of time.  In addition, he was

appointed president of CS in March of 2000.

15.     Defendant DAVID A. DENUNZIO was Head of Private Equity of CS in 1998,

1999,  and most or all of 2000.

16.     Defendant EDWARD NADEL, an attorney, was elected Vice President of Merchant

Capital, Inc. in January of 2000.  Throughout the period of time from January 1999 through

December of 2000, he served as Vice President and/or in-house counsel for the Legal and

Compliance Department of CS and/or Private Equity of CS.

17.     Defendants FRANK QUATTRONE, GEORGE BOUTROS, and WILLIAM

("Bill") BRADY (collectively "QBB") were under a direct employment agreement (as of June

1998) with CS as the heads of CSFBC's (and CS's) Technology Group (the "Technology Group").

Defendants QBB, JOHN HODGE, and JACK TEJAVANIJA were members of the investment

banking team hired from Deutsche Bank AG to start-up the Technology Group.  Collectively,

Quattrone, Boutros, Brady, Hodge, and Tejavanija, will be at times referred to collectively as the

"Original Members".

18.     At all relevant times QBB and John Hodge were the authorized managers of the

CSFBC Technology Group (collectively, the "Technology Group Managers").

19.     At times, the institutional defendants CSFBC (including its Technology Group),

CSFB-USA, CSFBI, CS, CSG and the individual defendants Quattrone, Boutros, Brady, Hodge, and Tejavanija will be referred to collectively as the "Bank Defendants."

20.     Quattrone, Boutros, Brady, Hodge, and Tejavanija will be at times collectively referred to as the "Individual Bank Defendants."

**Issuer Defendants**

21.     Issuer defendant AIRSPAN NETWORKS, INC. is headquartered in Boca Raton, Florida.  At all relevant times ERIC D. STONESTROM was the Chief Executive Officer ("CEO") for the company, and signed the Registration Statement for the Offering.  At all relevant times, JOSEPH J. CAFFARELLI was the Senior Vice President and Chief Financial Officer ("CFO") for the company, and signed the Registration Statement for the company's public offering ("Offering").

22.     Issuer defendant AT ROAD, INC., is headquartered in Fremont, California.  At all relevant times KRISH PANU was the CEO, President, Chairman of the Board ("Chairman") for the company, and signed the Registration Statement for the Offering.  At all relevant times, THOMAS C. HOSTER was the Senior Vice President and CFO for the company, and signed the Registration Statement for the Offering.

23.     Issuer defendant OCCAM NETWORKS, INC. (formerly "ACCELERATED NETWORKS, INC.") is headquartered in Santa Barbara, California.  At all relevant times SURESH NIHALANI was the CEO, Chairman, President and Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, FREDERIC T. BOYER was the Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

24.     Issuer defendant AVANTGO, INC. is headquartered in Hayward, California.  At all relevant times RICHARD OWEN was the CEO and Director for the company, and signed the

8

Registration Statement for the Offering.  At all relevant times, DAVID B. COOPER, JR. was the

CFO for the company, and signed the Registration Statement for the Offering.

25.     Issuer defendant AUTOWEB.COM, INC. (AUTOBYTEL, real party in interest) is

headquartered in Irvine, California.  At all relevant times DEAN A. DEBIASE was the CEO,

President and a Director for the company, and signed the Registration Statement for the Offering.

At all relevant times, SAMUEL M. HEDGPETH III was the Vice President, Treasurer, and CFO

for the company, and signed the Registration Statement for the Offering.

26.     Issuer defendant BSQUARE CORP. is headquartered in Bellevue, Washington.  At

all relevant times WILLIAM T. BAXTER was the CEO, President, and Chairman for the company,

and signed the Registration Statement for the Offering.  At all relevant times, BRIAN V. TURNER

was the Senior Vice President, Secretary, and CFO for the company, and signed the Registration

Statement for the Offering.

27.     Issuer defendant BLUE COAT SYSTEMS, INC. ( formerly "CACHEFLOW,

INC.") is headquartered in  Sunnyvale, California.  At all relevant times BRIAN M. NESMITH was

the CEO, President, and a Director for the company, and signed the Registration Statement for the

Offering.  At all relevant times, MICHAEL J. JOHNSON was the Vice President, Secretary, and

CFO for the company, and signed the Registration Statement for the Offering.

28.     Issuer defendant CLARENT CORP. (VERSO TECHNOLOGIES, INC., real party

in interest) is headquartered in Redwood City, California.  At all relevant times JERRY SHAW-

YAU CHANG was the CEO, President, and a Director for the company, and signed the Registration

Statement for the Offering.  At all relevant times, RICHARD J. HEAPS was the CFO, Chief

Operating Officer, General Counsel, and Secretary for the company, and signed the Registration

Statement for the Offering.

9

29.      Issuer defendant COMMERCE ONE, INC. is headquartered in Walnut Creek, California.  At all relevant times MARK B. HOFFMAN was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, PETER F. PERVERE was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

30.      Issuer defendant CORILLIAN CORP. is headquartered in Beaverton, Oregon.  At all relevant times TED F. SPOONER was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, STEVEN SIPOWICZ was the CFO and Secretary for the company, and signed the Registration Statement for the Offering.

31.      Issuer defendant CENTILLIUM COMMUNICATIONS, INC. is headquartered in - Fremont, California.  At all relevant times FARAJ AALAEI was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, JOHN W. LUHTALA was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

32.      Issuer defendant DIGITAL IMPACT, INC. is headquartered in San Mateo, California.  At all relevant times WILLIAM C. PARK was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, DAVID OPPENHEIMER was Vice President, Treasurer, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

33.      Issuer defendant E MACHINES, INC. is headquartered in Irvine, California.  At all relevant times STEPHEN A. DUKKER was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, STEVEN H. MILLER was the CFO, Secretary, and Vice President for the company, and signed the Registration Statement for the

Offering.

34.     Issuer defendant EFFICIENT NETWORKS, INC. is headquartered in Dallas, Texas. At all relevant times MARK A. FLOYD was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, JILL S. MANNING was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

35.     Issuer defendant E.PIPHANY, INC. is headquartered in San Mateo, California.  At all relevant times ROGER S. SIBONI was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, KEVIN J. YEAMAN was the CFO for the company, and signed the Registration Statement for the Offering.

36.     Issuer defendant EVOLVE SOFTWARE, INC. is headquartered in Emeryville, California.  At all relevant times JOHN P. BANTLEMAN was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, DOUGLAS S. SINCLAIR was the CFO, Corporate Secretary, and Treasurer for the company, and signed the Registration Statement for the Offering.

37.     Issuer defendant HANDSPRING, INC. is headquartered in Mountain View, California.  At all relevant times DONNA L. DUBINSKY was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, BERNARD J. WHITNEY was the CFO and Secretary for the company, and signed the Registration Statement for the Offering.

38.     Issuer defendant IMPROVENET, INC. is headquartered in Redwood City, California.  At all relevant times RONALD B. COOPER was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times,

11

RICHARD G. REECE was the Senior Vice President and CFO for the company, and signed the Registration Statement for the Offering.

39.     Issuer defendant INTERNAP NETWORK SERVICES CORP. is headquartered in - Seattle, Washington.  At all relevant times ANTHONY C. NAUGHTIN was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, PAUL E. MCBRIDE was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

40.     Issuer defendant INFORMATICA CORP. is headquartered in Palo Alto, California. At all relevant times GAURAV S. DHILLON was the CEO for the company, and signed the Registration Statement for the Offering.  At all relevant times, CRAIG L. KLOSTERMAN was the CFO for the company, and signed the Registration Statement for the Offering.

41.     Issuer defendant IPRINT TECHNOLOGIES, INC. (formerly "IPRINT.COM"; MADETOORDER.COM, INC., real party in interest) is headquartered in Menlo Park, California. At all relevant times ROYAL P. FARROS was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, JAMES P. MCCORMICK was the CFO and Secretary for the company, and signed the Registration Statement for the Offering.

42.     Issuer defendant INTRAWARE, INC. is headquartered in Orinda, California.  At all relevant times PETER H. JACKSON was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, DONALD M. FREED was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

43.     Issuer defendant INTERTRUST TECHNOLOGIES CORP. is headquartered in Santa Clara, California.  At all relevant times VICTOR SHEAR was the CEO and Chairman for the

12

company, and signed the Registration Statement for the Offering.  At all relevant times, ERWIN N. LENOWITZ was the CFO, Secretary, and Vice Chairman of the Board for the company, and signed the Registration Statement for the Offering.

44.     Issuer defendant INTERWOVEN, INC. is headquartered in Sunnyvale, California. At all relevant times MARTIN BRAUNS was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, DAVID M. ALLEN was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

45.     Issuer defendant LUMINENT, INC. is headquartered in Chadsworth, California.  At all relevant times WILLIAM R. SPIVEY was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, ERIC BLACHNO was the Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

46.     Issuer defendant LANTE CORP. (SBI AND COMPANY, real party in interest) is headquartered in Chicago, Illinois.  At all relevant times C. RUDY PURYEAR was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering. At all relevant times, BRIAN HENRY was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

47.     Issuer defendant VA SOFTWARE CORPORATION (formerly "VA LINUX SYSTEMS") is headquartered in  Fremont, California.  At all relevant times LARRY M. AUGUSTIN was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, TODD B. SCHULL was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

13

48.     Issuer defendant LIGHTSPAN PARTNERSHIP, INC. is headquartered in San Diego, California.  At all relevant times JOHN T. KERNAN was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, KATHLEEN R. MCELWEE was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

49.     Issuer defendant MCDATA CORPORATION is headquartered in Broomfield, Colorado.  At all relevant times JOHN F. MCDONNELL was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, DEE J. PERRY was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

50.     Issuer defendant MULTILINK TECHNOLOGY CORP. is headquartered in Somerset, New Jersey.  At all relevant times RICHARD N. NOTTENBURG was the CEO, President, and Co-Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, ERIC M. PILLMORE was the Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

51.     Issuer defendant MP3.COM (VIVENDI UNIVERSAL NET USA GROUP, INC., real party in interest) is headquartered in San Diego, California.  At all relevant times MICHAEL L. ROBERTSON was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, PAUL L. H. OUYANG was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

52.     Issuer defendant NUMERICAL TECHNOLOGIES, INC. is headquartered in San Jose, California.  At all relevant times Y. C. (BUNO) PATI was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times,

14

RICHARD MORA was the Senior Vice President and CFO for the company, and signed the Registration Statement for the Offering.

53.    Issuer defendant NEW FOCUS, INC. is headquartered in San Jose, California.  At all relevant times KENNETH E. WESTRICK was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, WILLIAM L. POTTS, JR. was the CFO for the company, and signed the Registration Statement for the Offering.

54.    Issuer defendant NOVATEL WIRELESS, INC. is headquartered in San Diego, California.  At all relevant times JOHN MAJOR was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, MELVIN FLOWERS was the Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

55.    Issuer defendant ONVIA.COM, INC. is headquartered in Seattle, Washington.  At all relevant times GLENN S. BALLMAN was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, MARK T. CALVERT was the Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

56.    Issuer defendant ONYX SOFTWARE CORP. is headquartered in Bellevue, Washington.  At all relevant times BRENT R. FREI was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, SARWAT H. RAMADAN was the Vice President, Secretary, Treasurer, and CFO for the company, and signed the Registration Statement for the Offering.

57.    Issuer defendant RAZORFISH, INC. (SBI AND COMPANY, real party in interest) is headquartered in Washington, D.C.  At all relevant times JEFFREY A. DACHIS was the CEO,

15

President, Treasurer, and a Director for the company, and signed the Registration Statement for the Offering. At all relevant times, SUSAN BLACK was the CFO for the company, and signed the Registration Statement for the Offering.

58.     Issuer defendant RETEK, INC. is headquartered in Minneapolis, Minnesota. At all relevant times JOHN BUCHANAN was the CEO, a Director, and Chairman for the company, and signed the Registration Statement for the Offering. At all relevant times, GREGORY A. EFFERTZ was the Vice President, Treasurer, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

59.     Issuer defendant PINNACOR, INC. (formerly "SCREAMINGMEDIA, INC.") is headquartered in New York, New York. At all relevant times KEVIN C. CLARK was the CEO and a Director for the company, and signed the Registration Statement for the Offering. At all relevant times, DAVID M. OBSTLER was the CFO for the company, and signed the Registration Statement for the Offering.

60.     Issuer defendant SILICON IMAGE, INC. is headquartered in Sunnyvale, California. At all relevant times DAVID D. LEE was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering. At all relevant times, DANIEL K. ATLER was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

61.     Issuer defendant SELECTICA, INC. is headquartered in San Jose, California. At all relevant times RAJEN JASWA was the CEO, President and Chairman for the company, and signed the Registration Statement for the Offering. At all relevant times, STEPHEN BENNION was the CFO, Vice President, and Secretary for the company, and signed the Registration Statement for the Offering.

16

62.     Issuer defendant SIMPLEX SOLUTIONS, INC. (CADENCE DESIGN SYSTEMS, INC., real party in interest) is headquartered in Sunnyvale, California.  At all relevant times PENELOPE A. HERSCHER was the CEO and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, LUIS P. BUHLER was the CFO for the company, and signed the Registration Statement for the Offering.

63.     Issuer defendant SUPPORTSOFT, INC. (formerly "SUPPORT.COM") is headquartered in Redwood City, California.  At all relevant times RADHA R. BASU was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering. At all relevant times, BRIAN M. BEATTIE was the CFO and Senior Vice President for the company, and signed the Registration Statement for the Offering.

64.     Issuer defendant TANNING TECHNOLOGY CORP. is headquartered in Denver, Colorado.  At all relevant times LARRY G. TANNING was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all relevant times, HENRY F. SKELSEY was the Vice President, CFO, and a Director for the company, and signed the Registration Statement for the Offering.

65.     Issuer defendant TICKETS.COM, INC. is headquartered in Costa Mesa, California. At all relevant times W. THOMAS GIMPLE was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, JOHN M. MARKOVICH was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

66.     Issuer defendant TUMBLEWEED COMMUNICATIONS CORP. is headquartered in Redwood City, California.  At all relevant times JEFFREY C. SMITH was the CEO, President, and Chairman for the company, and signed the Registration Statement for the Offering.  At all

17

relevant times, JOSEPH C. CONSUL was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

67.    Issuer defendant TRITON NETWORK SYSTEMS, INC. is headquartered in Orlando, Florida.  At all relevant times HOWARD (SKIP) SPEAKS was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, KENNETH R. VINES was the Senior Vice President and CFO for the company, and signed the Registration Statement for the Offering.

68.    Issuer defendant VIANT CORP. (DIVINE, INC. , real party in interest) is headquartered in Boston, Massachusetts.  At all relevant times ROBERT L. GETT was the CEO, President, and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, M. DWAYNE NESMITH was the Vice President and CFO for the company, and signed the Registration Statement for the Offering.

69.    Issuer defendant VITRIA TECHNOLOGY, INC. is headquartered in Sunnyvale, California.  At all relevant times JOMEI CHANG was the President and CEO for the company, and signed the Registration Statement for the Offering.  At all relevant times, PAUL AUVIL was the CFO for the company, and signed the Registration Statement for the Offering.

70.    Issuer defendant GLOBESPANVIRATA, INC. (formerly "VIRATA CORP.") is headquartered in Santa Clara, California.  At all relevant times CHARLES COTTON was the CEO and a Director for the company, and signed the Registration Statement for the Offering.  At all relevant times, ANDREW VOUGHT was the Senior Vice President, Secretary, and CFO for the company, and signed the Registration Statement for the Offering.

71.    The individual defendants identified in paragraphs 21 through 70 are hereinafter sometimes referred to as the "Individual Issuer Defendants."

72.     The Individual Issuer Defendants and the Issuers themselves (identified in
paragraphs 21 through 70) will at times be referred to collectively as the "Issuer Defendants."

73.     The Bank Defendants and the Issuer Defendants are, at times, referred to collectively
as the "Defendants."

*                    *                    *

74.     All Individual Issuer Defendants and Individual Bank Defendants are appropriately
treated as a group for pleading purposes; and it is also appropriate to presume that the false and
misleading information conveyed in each Issuer's Registration Statements, Prospectuses, Research
Reports, and other public filings, press releases, and other publications as alleged herein are the
collective actions of the narrowly defined group of Individual Issuer Defendants and Individual
Bank Defendants identified above.  Each of the Individual Issuer Defendants, by virtue of his high
level position with an Issuer, directly participated and was integrally involved in the management of
that Issuer, was directly involved in the day to day operations of that Issuer and was privy to
confidential proprietary information concerning that Issuer, its operations, finances, financial
condition, products, and present and future business prospects as alleged herein.  Such Individual
Issuer Defendants were personally involved in drafting, producing, reviewing, authorizing, and/or
disseminating the false and misleading statements alleged herein, and/or were provided with copies
of misleading research reports by CSFBC (or the Technology Group), Issuer's press releases,
Issuer's SEC filings, and other alleged misleading publications of, or about, the Issuer prior to or
shortly after their issuance, were aware that the false and misleading statements were being issued
regarding that Issuer and approved or ratified these statements.  Likewise, each of the Individual
Bank Defendants, by virtue of his high level position and/or central role in managing the
Technology Group, directly participated and/or was integrally involved in the management of the

19

Technology Group. Each was directly involved in the day to day operations of the Technology Group and was privy to confidential proprietary information concerning the Technology Group's handling of each Issuer's IPO stock offering, later offerings, production of revenue estimates, and Issuer's interaction with the Technology Group's research analysts. Each was aware of the operations, finances, financial condition, products, and present and future business prospects of each Issuer as alleged herein. Such Individual Bank Defendants were personally involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or were provided with copies of misleading research reports by CSFBC's (or the Technology Group's) analysts regarding Issuer, Issuer's press releases, Issuer's SEC filings, and other alleged misleading publications of, or about, the Issuer prior to or shortly after their issuance, were aware that the false and misleading statements were being issued regarding that Issuer and approved or ratified these statements.

75.    CSFBC was a managing underwriter of each of the Issuer's offerings identified by their prospectus date in Appendix A and Appendix B below. CSFBC had a duty to make certain that complete, accurate, and truthful information with respect to the Issuer's operations, financial condition, earnings, and future business prospects was contained in the Registration Statement and Prospectus, pursuant to which the offering was made. As part of the offering, CSFBC purported to conduct or participate in an investigation known as a "due diligence" investigation, into the financial condition, business operations, prospects and financial, accounting, and management control systems of each Issuer.

## CONSPIRACY AND CONCERTED ACTION

76.    In committing the wrongful acts alleged herein, Quattrone, Boutros, and Brady

("QBB"), the Technology Group, CSFBC and each of the Issuer Defendants (collectively, hereinafter the "Conspirators") have pursued a conspiracy, common enterprise, and/or common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan, scheme, or design.  During all relevant times hereto, the Conspirators, and each of them, initiated a course of conduct with the purpose and effect, *inter alia*, to fraudulently obtain money from the investing public by deceiving them regarding the accuracy of the each Issuer's IPO price and each Issuer's financial condition and future revenue prospects, thereby creating the appearance that the Issuers' revenue growth would be unpredictable.  In furtherance of this plan, conspiracy, and course of conduct, the Conspirators, and each of them, took the actions as herein set forth.

77.      QBB, the Technology Group, and CSFBC were collectively the central actors in the conspiracy (the "Core Conspirators").  These Core Conspirators developed the system of fraud described herein in paragraphs 90, recruited the Issuer Defendants to participate in the wrongful acts, and ultimately executed the conspiracy with each of the Issuers.

78.      Each Individual Issuer Defendant, because of his or her position of control and authority as an officer and/or director of the Issuer, was able to and did control the contents of the various quarterly and annual financial reports, revenue estimates, SEC filings, and press releases for the Issuer with which he or she was employed.  The Core Conspirators provided each Individual Issuer Defendant with copies of that Issuer's reports, releases, and filings alleged to have been misleading herein prior to or shortly after their issuance and each Individual Issuer Defendant had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their Board membership and/or executive and managerial positions with the Issuers, each of the Individual Issuer Defendants had access to non public information about that Issuer's  business,

21

finances, future business prospects, and revenue expectations via access to internal corporate documents, conversations, connections with corporate officers and employees, attendance at Board meetings and committees thereof and via reports and information provided to them in connection therewith. The Individual Issuer Defendants also participated directly in the Core Conspirators' scheme to profit from the fraudulent acts by personally owning or selling stock of the Issuer to the public and/or directing Issuer's sale of stock to the venture funds established and managed by the Core Conspirators as described herein.

79. The Conspirators accomplished their conspiracy, common enterprise, or common course of conduct of artificially affecting the price of Issuers' stock through the issuance of false and misleading quarterly and annual reports, SEC filings and reports, research reports, press releases to the public, and other sales-related communications to the public, which manipulated, misrepresented, and failed to disclose the true facts regarding Issuers' expected earnings, markets, business, revenues, management, financial condition, and future prospects. Each of the Conspirators was a direct and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

80. Each of the Conspirators is sued both individually and as a co-conspirator, and the liability of each arises from the fact that each engaged in all or part of the unlawful acts charged herein. In addition, there are other persons, the identities of whom are presently unknown to Plaintiff, who conspired in the commission of the wrongs alleged herein. Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a fraud and deceit upon Issuers' shareholders.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and, in the alternative, (b)(3) on behalf of herself and the members of a class ("Class") of plaintiffs, consisting of all persons and entities who purchased common stock of each Issuer during the dates set forth in Exhibit A, inclusive (the "Class Period"), and who were damaged thereby.

82.     The Class Period is comprised of fifty Subclass Periods as set forth in Exhibit A. Each Subclass of plaintiffs consists of all persons and entities who purchased that Issuer's securities in the open market during that Subclass Period. Each Subclass Period begins after the point in time of each Issuer's initial offering, and does not include purchases made in conjunction with the Initial public offering. Excluded from the Class are the Defendants, officers and directors of the Company, the members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

83.     As alleged herein, Defendants knowingly or recklessly disseminated materially false and misleading information to the investing public regarding, *inter alia*, the Issuers' revenue expectations. Defendants' conduct had the intended effect of creating the false impression among purchasers that the Issuers' revenue expectations were unpredictable. These actions artificially affected the prices plaintiffs paid for Issuers' securities during the Class Period.

84.     Shares of Issuers' securities were outstanding and actively and openly traded on the NASDAQ, an efficient market in which the price of the Issuers' stocks reflected publicly disseminated information about each Issuer, and millions of shares were traded during the Class Period.

85.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and

23

can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members of the Class. Record owners and other members of the Class may be identified from records maintained by the Issuers or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent in class and securities litigation.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        a.   whether the federal securities and other laws were violated by Defendants' acts as alleged herein;

        b.   whether Defendants participated in and pursued the common course of conduct complained of herein;

        c.   whether documents, press releases and other statements disseminated to the investing public and the Issuers' shareholders during the Class Period misrepresented material facts about the business, management, products, sales, markets, financial condition, and future business prospects of Issuers;

        d.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, future prospects, and finances of the

24

Issuers;

      e.  whether the Prospectuses, Analysts' Research Reports, and other public statements made by Defendants misrepresented and/or failed to disclose material facts;

      f.  whether the market prices of Issuers' securities during the Class Period were artificially affected due to the material misrepresentations and omissions and failure to correct the material misrepresentations and omissions complained of herein; and

      g.  whether the members of the Class have sustained damages and, if so, the proper measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action.

## GENERAL DESCRIPTION OF THE FRAUD

90.    The alleged fraud, in its essence, has two components: First, CSFBC, the Technology Group, and each Issuer would effectuate an initial public offering ("IPO") for each Issuer at a per-share offering price that was inaccurate.  CS and/or CSFBC's sales staff  then made selective disclosures of the fact of the inaccuracy of the IPO pricing to members of the investing public.  Second, CSFBC, the Technology Group, and each Issuer planned to and did act to defraud the market by knowingly disseminating false expectations about the Issuer's prospective financial performance, including false reports of Issuer's expected revenues and earnings.  The intended combined effect of their fraud was to manipulate each Issuer's stock price, so that, *inter alia*,

CSFBC, the Technology Group, and each Issuer could profit from the manipulations.

## TECHNOLOGY GROUP'S OPPORTUNITY TO COMMIT FRAUD

91.     To accomplish the fraud described in paragraph 90 above, CSFBC needed an opportunity to influence and conspire with each Issuer in setting the IPO price, and also an opportunity to influence and conspire with the Issuer in disseminating information to the market regarding the Issuer's expected financial performance.

92.     Typically, the direct liaison between an investment bank and a company in executing an IPO are the investment bankers, who are employed by the investment bank.  Executing IPOs, as well as other financing transactions for companies, is their primary employment function.

93.     In July of 1998, CS hired Frank Quattrone ("Quattrone") and several other investment bankers from Deutsche Bank AG to run a technology investment banking group (the Technology Group) for CS and CSFBC.

94.     At all relevant times, the Technology Group's operations were based in Silicon Valley.  At all relevant times, Quattrone was the head of the Technology Group, and he was granted the authority by CSFBC to employ and terminate employees in the Technology Group at will.

95.     Quattrone was granted unusual autonomy by CSFBC to structure the Technology Group in a manner in which he deemed reflected an optimal business strategy, including an integration of investment banking activities with equity-research analysts' activities.

96.     In furtherance of this strategy, Quattrone established a separate research department for his Technology Group ("Technology Research Team"), which included equity research analysts that would publish CSFBC research reports on technology companies with which CSFBC did business or might do business.

26

97.     The Technology Research Team reported directly to Quattrone.  Quattrone both supervised and paid the Technology Research Team.

98.     One of the chief tasks of an equity research analyst working for an underwriter is to disseminate information to the public markets regarding companies' expected financial performance.  This information is disseminated both orally and through the writing of periodic research reports, which are widely disseminated to the public market.  The public markets view this information as material, and its dissemination by an analyst can affect the price of a company's stock.

99.     The Technology Research Team included a number of "All-Star" analysts who were well recognized in the public marketplace and whose published opinions were influential on the prices of the securities they opined.  The prospect of receiving research coverage from one of these influential "All-Star" analysts in the Technology Research Team increased the likelihood that a company would select CSFBC and the Technology Group for its prospective IPO.

100.    The Technology Group, at the direction of Quattrone, used the direct involvement of the Technology Research Team's research analysts in all stages of the IPO process (Pre-IPO, IPO Marketing, and Post-IPO) as a marketing device to lure potential clients to its IPO practice.

101.    Analysts in the Technology Research Team published research reports on each of the companies that the Technology Group brought public in an IPO.

102.    Quattrone and the investment bankers in the Technology Group exerted direct influence on what the research analyst in the Technology Research Team wrote in their published research reports.

103.    As *Forbes* reported on September 23, 2001:

> [I]n Quattrone's shop, research was expected to serve the bankers'
> interests … [O]thers say he tried to bully them. "I'll have you out of here
> Monday morning if you say that "… managing director recalls Quattrone
> telling an analyst who wanted to issue a less than flattering report about a
> client. "Do you want to work in this firm? Do you want to be a team
> player? When it comes time for bonus review, all this will be
> remembered."

104.    The Technology Group maintained, and carried out, a policy of participating only in IPOs in which CSFBC would be designated the "Lead" manager or, at a minimum, a "Co-Lead" manager of the underwriting.

105.    The Lead or Co-Lead manager (also referred to as the "bookrunning" Manager(s) of any IPO exert a dominant position over any other investment banking syndicate-members who are involved in the selling of the company's stock in the IPO. This includes dominance over conducting the due-diligence of a company's financial condition, the review and dissemination of expectations about a company's future financial performance, and the final determination of the company's stock price in the IPO.

106.    The Technology Group was able to richly capitalize on its enhanced operating structure, moving to the forefront in all technology IPOs. As reported in Bloomberg News on June 27, 2001, "[I]n 2000, Quattrone's group was the undisputed king of the tech initial public offering business. It was one of Wall Street's top moneymaking endeavors, completing 47 deals—one out of every four computer, software, Internet and semiconductor initial public offerings." Additionally, on June 28, 2001, Bloomberg News issued a follow-up report stating that CSFBC was "the No. 1 underwriter of initial stock sales for computer, software, Internet and semiconductor companies in 1999 and 2000, garnering 24 percent of the market."

## TECHNOLOGY GROUP'S MOTIVE

107.    CSFBC, Quattrone, and each member of the Technology Group, including the other investment bankers and the research analysts in the Technology Research Team, had a direct financial incentive to (1) conduct as many IPOs as possible, and (2) take steps to ensure that an Issuer's stock price rose after the IPO.

108.    CSFBC profited directly from fees collected from taking a company to IPO.  The more IPOs performed, the more fees CSFBC collected.

109.    Quattrone and members of his Technology Group also profited directly from conducting as much IPO business as possible.  This was due to a revenue-sharing agreement that Quattrone and the Technology Group had with CSFBC and/or CS, which compensated them with half of the revenue (after certain costs) generated by the Technology Group.  The profit was to be distributed by Quattrone to himself and his Technology Group employees.

110.    As *The Wall Street Journal* reported on May 3, 2001, " [w]ith a revenue-sharing agreement with CSFB after certain costs, the [Quattrone] group had as much as $500 million to divide among its members in 1999, according to some former and current CSFB employees."

111.    Additionally, as *The Wall Street Journal* reported on November 13, 2001, "Mr. Quattrone's pay was based on production.  Thus, during the heady days for technology stocks, when CSFB was the premier underwriter of such offerings, he earned huge annual sums that approached $100 million, the people familiar with the firm say."

112.    Among those compensated from the Technology Group's share of IPO revenue were the analysts in the Technology Research Team.  Quattrone had final authority to determine the analysts' bonuses.

113.    CSFBC's standard practice was to compensate its research analysts for their

29

participation in generating investment banking business. As *The Wall Street Journal* reported on May 6, 2002, "[c]opies of job-offer letters from . . . Credit Suisse First Boston to candidates for research-analyst positions show that Wall Street analysts are paid, in part, for investment-banking business they help generate."

114.    In addition to their financial interest in conducting as much IPO business as possible, CSFBC, Quattrone, and the members of the Technology Group (including the other investment bankers and the research analysts in the Technology Research Team) had a financial interest in taking actions that would cause Issuers' stock prices to rise after the IPO.

115.    The perception that CSFBC sought to create was that its underwriting services created outsized economic returns. The desired outcome was to increase future demand for its IPO services. In addition, after the IPO date, CSFBC profited from its activities as a market-maker (buying and selling stocks for the public in the aftermarket for a fee) in the Issuers' stock. CSFBC and the Technology Group's scheme was to manufacture the perception among buyers that large economic returns accrued to holders of an Issuer's stock after a CSFBC(Technology Group)-led IPO. This had the desired effect of attracting additional buying demand and consequently trading volume that would not otherwise have occurred. Thus, CSFBC's profits from market-making trading were increased.

116.    In addition, Quattrone and his associates in the Technology Group sought to profit personally from CSFBC and the Technology Group's underwriting activities by establishing hedge funds. These hedge funds took pre-IPO stock from an Issuer client and then sold the stock after conducting the Issuer's IPO. As reported in *The Wall Street Journal* reported on May 3, 2001:

> Mr. Quattrone and two top CSFB aides—George Boutros and William
> Brady, his mergers and corporate-finance chiefs, respectively—were

general partners of the fund through a partnership named QBB
Management.  The general partnership allowed the three executives to
invest personally in the companies the fund invested in, some of which
Mr. Quattrone's group brought public only months later. . . .

[Quattrone] and two colleagues made a total of about $2 million after
paying a bargain price for shares of Interwoven, Inc., an internet software
firm, a few months before CSFB took Interwoven public, according to
regulatory filings.

117.    These funds were instrumental to the Technology Group's overall fraudulent
scheme, because *inter alia*, they allowed the Technology Group to curry favor with potential clients
of its IPO services, and allowed the members of the Technology Group to profit directly from their
fraudulent activities.

118.    CSFBC also sought to profit from these activities, allocating money to Quattrone to
similarly invest on its behalf in pre-IPO stock in clients about to go public.

119.    As reported in *The Wall Street Journal* reported on May 3, 2001:

As part of his deal with CSFB, which he joined in 1998, Mr. Quattrone
was given $25 million each year to invest for the firm in potential
underwriting clients about to go public.  Mr. Quattrone told associates the
fund would not only help the bank win underwriting business, but deliver
a rich investment return as well.

120.    In addition to the above hedge funds, CSFBC also engaged in pre-IPO venture
capital investments in several of its IPO offerings through other venture capital affiliates.

**TECHNOLOGY GROUP'S AND CSFBC'S ACTUAL KNOWLEDGE (SCIENTER)**

121.    CSFBC and the Technology Group had actual knowledge that their misstatements
and omissions were fraudulent, and they engaged in a marketing effort to sell their fraudulent

31

scheme.

122.    For each Issuer's IPO, the Issuer had actual knowledge of the misstatements and omissions described above because it had discussed with the Technology Group the pricing of the Issuer's stock in the IPO, as well as the expectations for the Issuer's prospective financial performance, including revenue growth.

## ISSUERS' MOTIVE

123.    Each Issuer had an interest in having its stock price trade dramatically higher than the IPO offering price.  This was because creating the perception that holders in the Issuer's stock were accruing large economic returns would attract additional buying demand by other investors that would not otherwise have occurred.  Additionally, this perception of large economic returns would increase the amount of publicity afforded to the Issuer from its IPO.

124.    Each Issuer also had a direct financial interest in influencing the stock price so it would appreciate post-IPO as much as possible.  This was for several reasons, including but not limited to: (1) each Issuer's stock would be more attractive to potential purchasers in any future stock offerings by that Issuer because, in part, the rise in the Issuer's stock price since IPO would be suggestive of further stock price rises for new purchasers, (2) any future sales of stock by the Issuer to the public at a higher stock price would raise money at a higher dollar-for-equity rate than had been garnered in the IPO, and (3) a higher stock price for the Issuer would be advantageous in seeking acquisition or merger opportunities with other companies.

125.    Individual Issuer Defendants also had a direct financial incentive in having the stock price appreciate as much as possible after the IPO.  This is because they personally owned stock in the Issuer, and a higher stock price directly increased their personal wealth.  In addition, a "lockup

agreement" made with CSFBC in connection with the IPO of each Issuer prevented the Individual Issuer Defendants from selling their shares of the Issuer for a significant period of time beyond the IPO date.  It was, thus, in their best interest for the Issuer's stock price to continue to rise post-IPO, at least until such time as they could sell their shares in the Issuer and realize profits.

126.    CSFBC and the Technology Group proposed to each Issuer that a higher stock price, post-IPO, would be advantageous in effectuating further sales of the Issuer's stock in so-called "Piggyback Offerings."  CSFBC and the Technology Group also proposed to Individual Issuer Defendants that they would be able to shorten the period of time that they were required to hold their existing stock in the Issuer (as required by the "lockup agreement"), and participate as sellers in these Piggyback Offerings of Issuer's stock.

127.    As *The Wall Street Journal* reported on February 17, 2000, CSFB used "piggyback" transactions to accelerate corporate insider's financial gains from public offerings:

> Corporate executives are supposed to be bound for a time before they can cash in on the price run-ups in their companies' IPOs.  But now, some executives have been given a key to indirectly open those lockup agreements.

> The secret lies not just in the typical 'follow on' sale to an initial public offering – that is, additional sales of new stock by the company.  Instead, the trendy maneuver is a hybrid stock offering dubbed a piggyback offering.

> It works like this: Before the expiration of the traditional lockup period that keeps corporate executives and other insiders from selling, the company returns to the market with a new sale of stock that includes both new shares from the company and those held by the insiders.

33

In the past, insiders – including venture capitalist and other founding investors—would have had to wait at least six months to sell any of their shares after an IPO. With the piggybacks, they can unload a portion of their holdings in as little as 90 days.

Some of Wall Street's biggest firms, which once rigidly held new companies to lockup agreements, have eased up . . . Credit Suisse Group's Credit Suisse First Boston . . . are among the firms that have led piggyback deals so far this year.

## ISSUERS' OPPORTUNITY

128.   It is unusual even among employees working for the same investment bank that investment bankers would have direct influence over, and be able to explicitly conspire with, the research analysts.

129.   As reported in *Bloomberg News* on May 3, 2001:

"Normally, there's a sort of dotted-line relationship between analysts and investment banking," said Samuel Hayes, a professor of investment banking at Harvard Business School. "In this case, Frank Quattrone had total supervision of these people. It was a doomed relationship."

130.   The Technology Group and CSFBC presented to each Issuer an unusual opportunity to create the appearance of unpredictable revenue growth and consequently influence the price of each Issuer's security.

## ISSUERS' ACTUAL KNOWLEDGE (SCIENTER)

131.   Each Issuer had actual knowledge that its IPO pricing was inaccurate because each Issuer and/or the Individual Issuer Defendants had discussions with the Technology Group regarding the pricing of the Issuer's stock for the IPO.

132.    In addition, each Issuer also had actual knowledge that the forecasts of the Issuer's future revenues (that were to be disseminated and published) were intended to create the appearance of unpredictable revenue growth because each Issuer and/or the Individual Issuer Defendants had also discussed those forecasts with the Technology Group.

## MISTATEMENTS AND OMMISSIONS IN EACH ISSUER'S PROSPECTUS

133.    Each Issuer's IPO Prospectus contained statements listing principal factors considered in determining the public offering price.  These statements are described with particularity for each Issuer in Exhibit C.

134.    These statements omitted to state the material fact that CSFBC, the Technology Group and each Issuer had knowingly set an inaccurate proposed offering price range (and consequently the public offering price), and that CS and/or CSFBC's sales staff made selective disclosures of this fact to members of the investing public.

135.    The fact of this inaccuracy was a necessary disclosure.  Without it, the statements in the Prospectus listing the principal factors considered in determining the public offering price were misleading because they seriously misrepresented the actual process used to determine each Issuer's offering price.

136.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein regarding the Issuers' prospectuses.  To the extent, however, that there were any forward-looking statements, the statutory safe harbor does not apply to any of the allegedly false statements pleaded herein regarding Issuer's Prospectus because those statements were made in connection with an initial public offering of stock, and such statements are excepted under 15 U.S.C. § 78u-5(b) of the statute.

137.    The "Bespeaks Caution" doctrine does not apply to the allegedly false statements pleaded herein. This is because those statements substantially affected the "total mix" of information provided to investors, and there were no meaningful, reasonably-specific cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; in addition, the particular speakers knew that the particular forward-looking statements were false, and/or the forward-looking statements were authorized and/or approved by an executive officer of CSFBC and/or of the Issuer company who knew that those statements were false when made.

## MISTATEMENTS AND OMMISSIONS IN CSFBC'S RESEARCH REPORTS

138.    CSFBC and the Technology Group published research reports for each Issuer that contained statements discussing the forecasted revenues of each Issuer, including a projected income statement for each Issuer.  These statements are described with particularity for each Issuer in Exhibit D.

139.    These statements failed to reveal, however, the material fact that the forecasted quarterly and annual revenues were set by the Issuer, CSFBC, and the Technology Group with the end of creating the appearance of unpredictable revenue growth.  This artifice is described above in paragraph 90 and is incorporated by reference herein.

140.    The material fact of the creation of this appearance of unpredictable revenue growth was a necessary disclosure.  Without it, the statements in the research reports discussing the forecasted revenues (and the projected income statement) of each Issuer were misleading since those statements purport to accurately present the objective beliefs of its authors.  The authors were in fact engaging in a fraudulent scheme to purposely create an appearance of unpredictable revenue

36

growth expected by each Issuer. Investors who relied in good faith upon the veracity of these forecasts were duped into expecting that each Issuer's revenues would grow unpredictably.

141.    The misstatements and omissions described in paragraphs 138-140 were made with CSFBC's (and the Technology Group's) actual knowledge, as described above in paragraphs 121-122 , and incorporated herein.

142.    The misstatements and omissions described in paragraphs 138-140 were made with each Issuer's actual knowledge, as described above in paragraphs 131-132 , and incorporated herein.

143.    The statutory safe harbor does not apply to any forward-looking statements pleaded herein. Alternatively, to the degree that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are still liable because, the speakers knew that the forward-looking statements were false when issued, and/or the forward-looking statements were authorized and/or approved by an executive officer of CSFBC, and/or of the Issuer company who knew that those statements were false when made. In addition, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

144.    The "Bespeaks Caution" doctrine does not apply to the allegedly false statements pleaded herein. This is because those statements substantially affected the "total mix" of information provided to investors, and there were no meaningful reasonably-specific cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In addition, the speakers knew that the forward-looking statements were false, and/or the forward-looking statements were authorized and/or approved by an executive officer of CSFBC and/or of the Issuer company, who knew that

37

those statements were false when made.

## FRAUDULENT SCHEME AND DECEITFUL COURSE OF BUSINESS

145.    The fraudulent misstatements and omissions described in paragraphs 133-144 above and incorporated herein were individual components of the Core Conspirators' larger fraudulent scheme described above in paragraph 90, and incorporated herein.

146.    The Core Conspirators, as the center and nexus of the conspiracy, engaged in this fraudulent scheme as its regular course of business, including the development of standardized practices and models to assist their scheme.

147.    CSFBC repeated this fraudulent scheme with each new Issuer's IPO performed by its Technology Group. By virtue of its repetition, this fraudulent scheme became a deceitful course of business for the Core Conspirators (CSFBC, the Technology Group, and QBB).

## CSG AND CS ASSIST AND PARTICIPATE

148.    CSG and CS assisted and participated in the fraudulent scheme described in the above paragraphs. CSG and CS accomplished this by, *inter alia*, sharing officers and/or directors of its Executive Boards or Board of Directors with subsidiaries that profited directly from the fraud alleged above. The assisting and participating officers and directors included John M. Hennessy, Allen D. Wheat, David A. DeNunzio, Richard Thornburgh, Charles Ward, and Edward Nadel. This commonality of membership between the officers and directors of CSG and CS with those of the subsidiaries ensured that CSG and CS were generally aware of, directed, authorized, and sponsored the activities of the subsidiaries.

149.    At all relevant times, CS had a direct and active relationship with QBB and also the Technology Group. CS directly employed QBB by virtue of its July 1998 employment contract

with QBB, and simultaneously employed the remainder of the Technology Group through CS's wholly owned subsidiaries. In addition, the contract with QBB provided for CS's direct, active, and continuing investment in the activities of QBB and the Technology Group by requiring CS to create and fund venture investment funds for (and with) QBB and the Technology Group.

150.    In addition, at all relevant times, CSG employed through its wholly owned subsidiaries QBB and the Technology Group. In addition, CSG at all times had the authority and power to prevent the venture fund activities of the Technology Group and QBB.

151.    These funds were instrumental to the Technology Group's overall fraudulent scheme, because *inter alia*, they allowed the Technology Group to curry favor with potential clients of its IPO services, and allowed the members of the Technology Group to profit directly from their fraudulent activities.

152.    CS and CSG each had a general awareness that its role was part of an overall activity that was improper. Executive members and/or senior managers had raised concerns about the propriety and/or legality of these venture funds, and these venture fund transactions were not part of the normal course of business for CS or CSG. Alternatively, CS and CSG knew or should have known that something improper was occurring because CS and CSG had a special duty to the investing public by virtue of its underwriting, investment advisory, and broker dealer operations.

## PURPOSEFUL DESTRUCTION OF EVIDENCE OF WRONGDOING

153.    In anticipation of litigation, and to eliminate evidence of wrongdoing, members of the Technology Group, at the direction of its senior management, purposely destroyed records, files, and other relevant evidence relating to the violations of securities laws alleged in this complaint.

## KNOWINGLY FALSE STATEMENTS—JOINT AND SEVERAL LIABILITY

154.    The Defendants and each of them are jointly and severally liable for the alleged fraud, since, as discussed in the paragraphs above, each of them knowingly made misstatements and omissions and each of them knew that the Plaintiff and other Members of the Class were likely to reasonably rely on them.

## INSIDER TRADING IN THE AFTERMARKET BY THE BANK DEFENDANTS

155.    After each IPO, the Bank Defendants sold the Issuer's stock that the Bank Defendants had purchased prior to the IPO through venture capital investments by the hedge funds established by QBB and the Technology Group, and/or through other venture capital affiliates of the Bank Defendants.

156.    At the time that the Bank Defendants sold the Issuer stock that they had bought pre-IPO as described above, they were in possession of material, non-public information affecting the price of the publicly traded stock.

157.    The Bank Defendants were in possession of this material information both from their fiduciary role as the underwriter of each Issuer's IPO and from their complicity with each Issuer in the public dissemination of fraudulent information regarding the expected financial performance of the Issuer.  The dissemination of fraudulent information  included the publication of research reports by CSFBC and/or the Technology Group's research analysts that had the purpose of creating the appearance of unpredictable revenue growth.

158.    The Bank Defendants sold the Issuers' stock that they had purchased pre-IPO to the public marketplace in the aftermarket period at prices that were inflated by these material misrepresentations.  The Bank Defendants had knowledge of these material misrepresentations, and were complicit in them, but the fact of the misrepresentations was unknown to the public

marketplace.

## INSIDER TRADING IN THE AFTERMARKET BY THE
## INDIVIDUAL ISSUER DEFENDANTS

159.   After each IPO, the Individual Issuer Defendants also personally sold their Issuer's

stock that they had received prior to the IPO.  At the time the Individual Issuer Defendants sold

their pre-IPO stock, they were in possession of material, non-public information affecting the price

of the publicly traded stock.

160.   The Individual Issuer Defendants were in possession of this material information

through their complicity with the Bank Defendants in the public dissemination of fraudulent

information regarding the expected financial performance of their Issuer.  The dissemination of

fraudulent information  included the publication of research reports by CSFBC and/or the

Technology Group's research analysts that had the purpose of creating the appearance of

unpredictable revenue growth.

161.   The Individual Issuer Defendants sold their Issuer's stock that they had acquired pre-

IPO at prices that were inflated by these material misrepresentations.  The Individual Issuer

Defendants had knowledge of these material misrepresentations, and were complicit in them, but

the fact of the misrepresentations was unknown to the public marketplace.

## INSIDER TRADING IN THE FOLLOW-ON  ("SECONDARY")
## OFFERING BY THE BANK DEFENDANTS

162.   This subsection applies only to the Bank Defendants' sales in the Secondary

Offerings identified in Exhibit B ("Secondary Offerings").

163.   At the time of each Secondary Offering, the Bank Defendants were in possession of

material, non-public information affecting the price of the Issuer's publicly traded stock.  This

41

information is described above in paragraph 157 and incorporated herein by reference.

164.    The Bank Defendants participated as selling shareholders in each Secondary Offering and sold some or all of their pre-IPO stock in each Secondary Offering at a price that was inflated by these material misrepresentations. The Bank Defendants had knowledge of these material misrepresentations, and were complicit in them, but the fact of the misrepresentations was unknown to the public marketplace.

**INSIDER TRADING IN THE FOLLOW-ON (SECONDARY)
OFFERING BY THE ISSUER**

165.    This subsection applies only to those Issuers who had Secondary Offerings, as identified in Exhibit B ("Secondary Offerings") below.

166.    At the time of each Issuer's Secondary Offering, the Issuer was in possession (through its executive officers and/or directors) of material, non-public information affecting the price of that Issuer's publicly traded stock. This information is described above in paragraph 160 and incorporated herein by reference.

167.    The Issuers sold some of their stock in the Secondary Offering at a price that was inflated by these material misrepresentations. Each Issuer had knowledge of these material misrepresentations, and were complicit in them, but the fact of the misrepresentations was unknown to the public marketplace.

**INSIDER TRADING IN THE FOLLOW-ON (SECONDARY)
OFFERING BY THE INDIVIDUAL ISSUER DEFENDANTS**

168.    This subsection applies only to the Individual Issuer Defendants' sales of their Issuer's stock in the Secondary Offerings identified in Exhibit B ("Secondary Offerings") .

169.    At the time of each Issuer's Secondary Offering, the Individual Issuer Defendants

42

were in possession of material, non-public information affecting the price of that Issuer's publicly

traded stock. This information is described above in paragraph 160 and incorporated herein by

reference.

170.     The Individual Issuer Defendants participated as selling shareholders in their

Issuer's Secondary Offering and sold some or all of their pre-IPO stock in the offering at a price that

was inflated by these material misrepresentations. The Individual Issuer Defendants had knowledge

of these material misrepresentations, and were complicit in them, but the fact of the

misrepresentations was unknown to the public marketplace.

## FIRST CLAIM: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER BY THE CORE CONSPIRATORS (BY PLAINTIFF AND CLASS MEMBERS AGAINST QBB, THE TECHNOLOGY GROUP, AND CSFBC)

171.     Plaintiff incorporates by reference and realleges the allegations as set forth above.

172.     This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. Section

78j(b), and Rule 10b-5 promulgated thereunder.

173.     During the Class Period, the Defendants, singularly and in concert, engaged in a

plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly

and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as

a fraud upon Plaintiff and other members of the Class, and made various untrue statements of

material facts and omitted to state material facts necessary in order to make the statements made not

misleading to Plaintiff and other Class members. The purposes and effect of said scheme was to

create the illusion of unpredictable revenue growth by each Issuer so that Defendants could profit

from the purchase or sale of resulting price-manipulated securities owned by them, profit from

increased underwriting and market making fees resulting from the price manipulation, and induce

43

Plaintiff and the members of the Class to purchase common stock at artificially manipulated prices.

174.    During the Class Period, the Defendants, pursuant to said plan, scheme, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public which were contained in the various documents and releases specified herein, and failed to disclose material facts to the investing public.

175.    The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the price of each Issuer's common stock.

176.    The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the ability to market the Issuer's common stock. The Defendants, by acting as hereinabove described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a deceit and fraud upon Plaintiff and the members of the Class.

177.    The Defendants are liable as direct participants in the wrongs complained of herein. The Defendants had a duty to promptly disseminate accurate and truthful information with respect to each Issuer's operations, financial condition, and anticipated revenues so that the price of the Issuer's common stock would be based on truthful and accurate information. The Defendants participated in the wrongdoing complained of in order to create and continue the illusion of unpredictability of Issuers' prospects for revenue growth.

178.    As a result of the dissemination of the aforementioned false and misleading reports, releases and financial statements, the price of each Issuer's common stock was artificially manipulated  throughout the Class Period.  In ignorance of the purposeful scheme designed, *inter*

44

*alia,* to create the appearance of unpredictable revenue growth, which was concealed by the Defendants, Plaintiff and the members of the Class purchased Issuer securities at artificially manipulated prices relying upon the integrity of the securities markets and were damaged thereby.

179.    Had Plaintiff and the members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the securities of Issuer at all or, if so, not at the artificially manipulated prices they did.

180.    By virtue of the foregoing, the defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Issuers' securities during the Class period.

**SECOND CLAIM: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER BY ISSUER DEFENDANTS (BY PLAINTIFF AND/OR CLASS MEMBERS AGAINST EACH ISSUER & INDIVIDUAL ISSUER DEFENDANTS)**

182.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

183.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. Section 78j(b), and Rule 10b-5 promulgated thereunder.

184.    During the Class Period, the Defendants, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading to Plaintiff and other Class members.  The purpose and effect of said scheme was to

45

create the illusion of unpredictable revenue growth so that Defendants could profit from the purchase or sale of resulting price-manipulated securities owned by them and induce Plaintiff and the members of the Class to purchase common stock at artificially manipulated prices.

185.    During the Class Period, the Defendants, pursuant to said plan, scheme, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public which were contained in the various documents and releases specified herein, and failed to disclose material facts to the investing public.

186.    The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the price of the Issuer's common stock.

187.    The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the ability to market the Issuer's common stock. The Defendants, by acting as hereinabove described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a deceit and fraud upon Plaintiff and the members of the Class.

188.    The Defendants are liable as direct participants in the wrongs complained of herein. The Defendants had a duty to promptly disseminate accurate and truthful information with respect to Issuer's operations, financial condition, and revenues so that the price of the Issuer's common stock would be based on truthful and accurate information. The Individual Issuer Defendants, because of their position of control and authority, were able to and did, directly or indirectly, control the content of the various financial reports, statements, and press releases of Issuer. The Defendants participated in the wrongdoing complained of in order to create and continue the illusion of

46

unpredictability of Issuers' prospects for revenue growth.

189.    As a result of the dissemination of the aforementioned false and misleading reports, releases and financial statements, the price of the Issuer's common stock was artificially manipulated throughout the Class Period.  In ignorance of the purposeful scheme designed, *inter alia,* to create the appearance of unpredictable revenue growth, which was concealed by the Defendants, Plaintiff and the members of the Class purchased Issuer securities at artificially manipulated prices relying upon the integrity of the securities markets and were damaged thereby.

190.    Had Plaintiff and the members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the securities of Issuer at all or, if so, not at the artificially manipulated prices they did.

191.    By virtue of the foregoing, the defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

192.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Issuers' securities during the Class period.

### THIRD CLAIM:  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT (AGAINST THE INDIVIDUAL DEFENDANTS ONLY BY PLAINTIFF AND CLASS MEMBERS)

193.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

194.    By reason of their positions as senior managers and/or directors as alleged above, the Individual Defendants had the power to influence, and exercised such power, to cause Issuer to engage in the unlawful acts and conduct complained of herein.

195.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant

47

to Section 15 of the Securities Act.  As a direct and proximate result of the Individual Defendants'

wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with

their purchases of Issuers' securities during the Class Period.

**FOURTH CLAIM: FOR VIOLATIONS OF**
**SECTION 12(a)(2) OF THE SECURITIES ACT**
**(BY PLAINTIFF AND CLASS MEMBERS AGAINST DEFENDANT CSFBC)**

196.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

197.    This count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §

77l(a)(2), on behalf of Plaintiff and other members of the Class against CSFBC.  It does not sound

in fraud.

198.    CSFBC, as underwriter and dealer manager of Issuers' Offerings, solicited the

purchase of Issuers' securities by Plaintiff and the Class Members and offered those securities on

behalf of itself and Issuers; and CSFBC was motivated (at least in part) in doing so, by desire to

serve its own financial interests and/or those financial interests of persons deemed to be a "seller" of

the Issuer securities under the federal securities laws and related state laws.

199.    As detailed above, the Prospectus for each Issuer's Offering contained several

material misstatements and omitted to state several material facts which were necessary to make the

statements made, in light of the circumstances in which they were made, not misleading.

200.    As a result, in contravention of Section 12(a)(2) of the Securities Act, CSFBC

offered and sold securities to Plaintiff and the Class Members by means of a prospectus or oral

communication which included an untrue statement of material fact or omitted to state a material

fact necessary to make the statements made, in light of the circumstances in which they were made,

not misleading, by the use of means or instrumentalities in and of interstate commerce or by use of

the mails, where Plaintiff did not know of the untruths and/or omissions and where CSFBC knew

or, in the exercise of reasonable care, could have known of them.

201.    Plaintiff and the other members of the Class, hereby tender to CSFBC the Issuer

securities which they purchased in the Offerings and still hold, and Plaintiff and the other members

of the Class demand rescission of that purchase, together with restitution and repayment of the

consideration which Plaintiff and the other members of the Class paid in connection therewith, plus

interest.

202.    Less than three years has elapsed from the time that the securities upon which this

Count is brought were sold to the public to the time of the filing of this action.  Less than one year

has elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts

upon which this Count is based to the time of the filing of this action.

## FIFTH CLAIM:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT BY THE TECHNOLOGY GROUP MANAGERS (BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST THE TECHNOLOGY GROUP MANAGERS ONLY)

203.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

This claim for relief is based on Section 20(a) of the Exchange Act.

204.    At all relevant times, the Technology Group Managers, by virtue of their offices,

directorships, and the specific acts heretofore described, were controlling persons of the Technology

Group within the meaning of Section 20(a) of the Exchange Act.

205.    At all relevant times, pursuant to their positions of control, the Technology Group

Managers possessed the power to direct, or cause the direction of, the Technology Group's

management, operations, business, and Policies. In addition, the Technology Group Managers

possessed the power to directly or indirectly control or influence the specific corporate policy which

49

governed the Technology Group's management, operations, business, and Policies.  As such and at all relevant times, the Technology Group Managers were controlling persons of the Technology Group within Section 20(a) of the Exchange Act.

206.    The Technology Group Managers had the power and influence, and exercised the same, to cause the Technology Group to engage in the illegal conduct and practices complained of herein.

207.    By reason of their position of control over the Technology Group, as alleged above, the Technology Group Managers are liable jointly and severally with and to the same extent as the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

## SIXTH CLAIM:  FOR CSFBC'S VIOLATIONS OF
## SECTION 20(a) OF THE EXCHANGE ACT
## (BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST CSFBC ONLY)

208.    Plaintiff incorporates by reference and realleges the allegations as set forth above. This claim for relief is based on Section 20(a) of the Exchange Act.

209.    As alleged above, at all relevant times CSFBC employed the Technology Group as an agent of its corporation.  CSFBC, by virtue of its corporate position of control, authority, employment, and/or contract was a controlling person of the Technology Group within the meaning of Section 20(a) of the Exchange Act.

210.    At all relevant times, pursuant to its position of control, CSFBC possessed the power to direct, or cause the direction of, the Technology Group's management, operations, business, and Policies. In addition, CSFBC possessed the power to directly or indirectly control or influence the

specific corporate policy which governed the Technology Group's management, operations, business, and Policies. As such and at all relevant times, CSFBC was a controlling person of the Technology Group within Section 20(a) of the Exchange Act.

211.     In addition, CSFBC as an underwriter and/or broker and/or dealer had a duty to the public with respect to the Technology Group. CSFBC failed in this duty by, among other things, failing to maintain adequate oversight and/or hiring and/or training standards for the Technology Group. Further, CSFBC failed to adequately supervise the Technology Group, and failed to enforce any adequate standards which they had.

212.     By reason of their position of control over the Technology Group, as alleged above, CSFBC is liable jointly and severally with and to the same extent as the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

<u>**SEVENTH CLAIM: FOR CS'S VIOLATIONS OF**</u>
<u>**SECTION 20(a) OF THE EXCHANGE ACT**</u>
<u>**(BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST CS ONLY)**</u>

213.     Plaintiff incorporates by reference and realleges the allegations as set forth above. This claim for relief is based on Section 20(a) of the Exchange Act.

214.     As alleged above, at all relevant times CS wholly owned CSFBC and/or the Technology Group. CS, by virtue of its ownership position of CSFBC and/or the Technology Group and control, authority, employment, and/or contract was a controlling person of CSFBC and/or the Technology Group within the meaning of Section 20(a) of the Exchange Act.

215.     At all relevant times, pursuant to its position of control, CS possessed the power to

direct, or cause the direction of, CSFBC and/or the Technology Group's management, operations, business, and Policies. In addition, CS possessed the power to directly or indirectly control or influence the specific corporate policy which governed CSFBC and/or the Technology Group's management, operations, business, and Policies. As such and at all relevant times, CS was a controlling person of CSFBC and/or the Technology Group within Section 20(a) of the Exchange Act.

216.    In addition, CS as an investment advisor and/or broker and/or dealer had a duty to the public with respect to CSFBC and/or the Technology Group. CS failed in this duty by, among other things, failing to maintain adequate oversight and/or hiring and/or training standards for CSFBC and/or the Technology Group. Further, CS failed to adequately supervise CSFBC and/or the Technology Group, and failed to enforce any adequate standards which they had.

217.    By reason of their position of control over CSFBC and/or the Technology Group, as alleged above, CS is liable jointly and severally with and to the same extent as CSFBC and/or the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

**EIGHTH CLAIM:  FOR CSG'S VIOLATIONS OF**
**SECTION 20(a) OF THE EXCHANGE ACT**
**(BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST CSG ONLY)**

218.    Plaintiff incorporates by reference and realleges the allegations as set forth above. This claim for relief is based on Section 20(a) of the Exchange Act.

219.    As alleged above, at all relevant times CSG wholly owned CSFBC. CSG, by virtue of its ownership position of CSFBC and/or the Technology Group and control, authority,

employment, and/or contract was a controlling person of CSFBC and/or the Technology Group within the meaning of Section 20(a) of the Exchange Act.

220.    At all relevant times, pursuant to its position of control, CSG possessed the power to direct, or cause the direction of, CSFBC and/or the Technology Group's management, operations, business, and Policies.  In addition, CSG possessed the power to directly or indirectly control or influence the specific corporate policy which governed CSFBC and/or the Technology Group's management, operations, business, and Policies.  As such and at all relevant times, CSG was a controlling person of CSFBC and/or the Technology Group within Section 20(a) of the Exchange Act.

221.    In addition, CSG as an investment advisor and/or broker and/or dealer had a duty to the public with respect to CSFBC and/or the Technology Group.  CSG failed in this duty by, among other things, failing to maintain adequate oversight and/or hiring and/or training standards for the CSFBC and/or the Technology Group.  Further, CSG failed to adequately supervise the Technology Group, and failed to enforce any adequate standards which they had.

222.    By reason of their position of control over CSFBC and/or the Technology Group, as alleged above, CSG is liable jointly and severally with and to the same extent as CSFBC and/or the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

**NINTH CLAIM:  FOR EACH ISSUER'S VIOLATIONS OF
SECTION 20(a) OF THE EXCHANGE ACT
(BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST EACH ISSUER ONLY)**

223.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

This claim for relief is based on Section 20(a) of the Exchange Act.

224.    As alleged above, at all relevant times each Issuer employed its Individual Issuer Defendants.  Each Issuer, by virtue of its corporate position of employment, control, and authority was a controlling person of its Individual Issuer Defendants within the meaning of Section 20(a) of the Exchange Act.

225.    At all relevant times, pursuant to its position of control, each Issuer possessed the power to direct, or cause the direction of, its Individual Issuer Defendants' management, operations, business, and Policies.  In addition, each Issuer possessed the power to directly or indirectly control or influence the specific corporate policy which governed its Individual Issuer Defendants' management, operations, business, and Policies.  As such and at all relevant times, each Issuer was a controlling person of its Individual Issuer Defendants within Section 20(a) of the Exchange Act.

226.    By reason of its position of control over its Individual Issuer Defendants, as alleged above, each Issuer is liable jointly and severally with and to the same extent as its Individual Issuer Defendants are liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of each Issuer's securities during the Class Period as a result of the wrongful conduct alleged herein.

## TENTH CLAIM:  FOR CSFBC'S LIABILITY UNDER *RESPONDEAT SUPERIOR* FOR THE FRAUDULENT ACTS OF THE TECHNOLOGY GROUP (BUT NOT INCLUDING QBB) (BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST CSFBC ONLY)

227.    Plaintiff incorporates by reference and realleges the allegations as set forth above.  This claim for relief is based on the common law of respondeat superior.

228.    As alleged above, CSFBC at all relevant times employed the Technology Group as an agent of its corporation.

54

229. As alleged above, the acts of the Technology Group in carrying out its fraudulent scheme were committed while acting within the scope of its employment to CSFBC. The scope of the Technology Group's employment included investment banking, equity research, and equity sales activities for CSFBC, and the fraudulent scheme was executed by means of the same activities.

230. CSFBC was negligent in allowing the fraudulent acts of the Technology Group to be executed and continued. CSFBC knew, or should have known, of all or at least some part of the Technology Group's fraudulent activities and that knowledge required CSFBC to investigate, control, and prevent the Technology Group from carrying out its fraudulent scheme. In addition, or in the alternative, CSFBC was negligent in supervising the activities of the Technology Group because the Technology Group could not have carried out its fraudulent scheme without the support and operations of CSFBC.

231. In addition, as a securities underwriter and/or broker and/or dealer, CSFBC had a non-delegable duty to the public, based upon the public's trust, to diligently and adequately supervise its operations, including the operations of the Technology Group. CSFBC failed in this duty by failing to adequately supervise the Technology Group. Among other things, CSFBC failed to maintain adequate oversight and/or hiring and/or training standards for the Technology Group, and/or failed to enforce any adequate standards which they had.

232. By reason of its position of employment over the Technology Group, as alleged above, CSFBC is liable jointly and severally with and to the same extent as the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

**ELEVENTH CLAIM:  FOR CS'S LIABILITY UNDER *RESPONDEAT SUPERIOR* FOR THE FRAUDULENT ACTS OF QBB AND/OR THE TECHNOLOGY GROUP (BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST CS ONLY)**

233.    Plaintiff incorporates by reference and realleges the allegations as set forth above. This claim for relief is based on the common law of respondeat superior.

234.    As alleged above, CS at all relevant times employed QBB and/or the Technology Group as an agent of its corporation.

235.    As alleged above, the acts of the QBB and/or the Technology Group in carrying out its fraudulent scheme were committed while acting within the scope of its employment to CS.  The scope of the QBB and/or the Technology Group's employment included investment banking, equity research, and equity sales activities for CS, and the fraudulent scheme was executed by means of the same activities.

236.    CS was negligent in allowing the fraudulent acts of the QBB and/or the Technology Group to be executed and continued.  CS knew, or should have known, of all or at least some part of the QBB and/or the Technology Group's fraudulent activities and that knowledge required CS to investigate, control, and prevent the QBB and/or the Technology Group from carrying out its fraudulent scheme.  In addition, or in the alternative, CS was negligent in supervising the activities of the QBB and/or the Technology Group because the QBB and/or the Technology Group could not have carried out its fraudulent scheme without the support and operations of CS.

237.    In addition, as a securities underwriter and/or broker and/or dealer, CS had a non-delegable duty to the public, based upon the public's trust, to diligently and adequately supervise its operations, including the operations of the QBB and/or the Technology Group.  CS failed in this duty by failing to adequately supervise the QBB and/or the Technology Group. Among other things, CS failed to maintain adequate oversight and/or hiring and/or training standards for the QBB and/or

56

the Technology Group, and/or failed to enforce any adequate standards which they had.

238.   By reason of its position of employment over the QBB and/or the Technology Group, as alleged above, CS is liable jointly and severally with and to the same extent as the QBB and/or the Technology Group is liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

## TWELVTH CLAIM: FOR EACH ISSUER'S LIABILITY UNDER *RESPONDEAT SUPERIOR* FOR THE FRAUDULENT ACTS OF ITS INDIVIDUAL ISSUER DEFENDANTS
## (BY ALL PLAINTIFF AND CLASS MEMBERS AGAINST EACH ISSUER ONLY)

239.   Plaintiff incorporates by reference and realleges the allegations as set forth above. This claim for relief is based on the common law of respondeat superior.

240.   As alleged above, at all relevant times each Issuer employed its Individual Issuer Defendants.

241.   As alleged above, the acts of each Issuer's Individual Issuer Defendants in carrying out their fraudulent scheme with the Technology Group were committed while acting within the scope of their employment with Issuer.  The scope of each Issuer's Individual Issuer Defendants' employment included working with the Issuer's underwriters in preparing the initial public offering, disclosing accurate financial information (including financial forecasts) to the underwriters, disclosing accurate financial information (including financial forecasts) to the equity research analysts, disseminating truthful information to the public through the underwriters, and disseminating truthful information to the public through the equity research analysts.  The corporate officer's fraudulent scheme was executed by means of the same activities.

242.   Each Issuer was negligent in allowing the fraudulent acts of its Individual Issuer

Defendants to be executed and continued. Each Issuer knew, or should have known, of all or at least some part of its Individual Issuer Defendants' fraudulent scheme and that knowledge required each Issuer to investigate, control, and prevent their Individual Issuer Defendants from carrying out the fraudulent scheme. In addition, or in the alternative, each Issuer was negligent in supervising the activities of its Individual Issuer Defendants because the Individual Issuer Defendants could not have carried out their fraudulent scheme without the support and operations of Issuer.

243.    In addition, as a registered public company, each Issuer had a non-delegable duty to the public, based upon the public's trust, to diligently and adequately supervise its Individual Issuer Defendants' communications to the public. Each Issuer failed in this duty by failing to adequately supervise their Individual Issuer Defendants, and/or to maintain adequate oversight standards for its Individual Issuer Defendants.

244.    By reason of its position of employment over its Individual Issuer Defendants, as alleged above, each Issuer is liable jointly and severally with and to the same extent as the Individual Issuer Defendants are liable to Plaintiff and the other members of the Class for the damages which they suffered in connection with their purchases of Issuers' securities during the Class Period as a result of the wrongful conduct alleged herein.

## THIRTEENTH CLAIM: FOR VIOLATIONS OF COMMON LAW FRAUD
## (BY PLAINTIFF AND CLASS MEMBERS AGAINST ALL DEFENDANTS)

245.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

246.    This Count is based upon common law fraud.

247.    During the Class Period, the Defendants, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as

a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading to Plaintiff and other Class members. The purposes and effect of said scheme was to create the illusion of unpredictable revenue growth so that Defendants could profit from the purchase or sale of the resulting price-manipulated securities owned by them and induce Plaintiff and the other members of the Class to purchase common stock at artificially manipulated prices.

248.    During the Class Period, the Defendants, pursuant to said plan, scheme, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public which were contained in the various documents and releases specified herein, and failed to disclose material facts to the investing public.

249.    The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the price of the Issuers' common stock.

250.    The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the ability to market the Issuers' common stock. The Defendants, by acting as hereinabove described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a deceit and fraud upon Plaintiff and the other members of the Class.

251.    The Defendants are liable as direct participants in the wrongs complained of herein. The Defendants had a duty to promptly disseminate accurate and truthful information with respect to Issuer's operations, financial condition, and earnings so that the price of Issuers' common stock would be based on truthful and accurate information. The Defendants participated in the

59

wrongdoing complained of in order to continue the illusion of the unpredictability of Issuers' prospects for revenue growth.

252.    As a result of the dissemination of the aforementioned false and misleading reports, releases and financial statements, the price of Issuers' common stock was artificially manipulated throughout the Class Period.  In ignorance of the purposeful scheme designed to create the illusion of unpredictable revenue growth, which was concealed by the Defendants, Plaintiff and the other members of the Class justifiably relied on the false and misleading reports, releases, and financial statements, and as a result, purchased Issuer securities at artificially manipulated prices and were damaged thereby.

253.    Had Plaintiff and the other members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the securities of Issuer at all or, if so, not at the artificially manipulated prices they did.

254.    By virtue of the foregoing, the defendants each committed fraud.

255.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Issuers' securities during the Class period.

### FOURTEENTH CLAIM:  FOR VIOLATIONS OF FLORIDA BLUE SKY LAW (BY PLAINTIFF AND CLASS MEMBERS AGAINST ALL DEFENDANTS)

256.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

257.    This Count is based upon the Florida Blue Sky Law, F.S.A. Section 517.301.

258.    During the Class Period, the Defendants, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as

60

a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading to Plaintiff and other Class members. The purposes and effect of said scheme was to create the illusion of unpredictable revenue growth so that Defendants could profit from the purchase or sale of resulting price-manipulated securities owned by them and induce Plaintiff and the other members of the Class to purchase common stock at artificially manipulated prices.

259.     During the Class Period, the Defendants, pursuant to said plan, scheme, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public which were contained in the various documents and releases specified herein, and failed to disclose material facts to the investing public.

260.     The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the price of Issuers' common stock.

261.     The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the ability to market the Issuers' common stock. The Defendants, by acting as hereinabove described, did so knowingly or in such a reckless or grossly negligent manner as to constitute a deceit and fraud upon Plaintiff and the other members of the Class.

262.     The Defendants are liable as direct participants in the wrongs complained of herein. The Defendants had a duty to promptly disseminate accurate and truthful information with respect to Issuers' operations, financial condition, and earnings so that the price of the Issuers' common stock would be based on truthful and accurate information. The Defendants participated in the

61

wrongdoing complained of in order to continue the illusion of the unpredictability of Issuers' prospects for revenue growth.

263.    As a result of the dissemination of the aforementioned false and misleading reports, releases and financial statements, the price of Issuers' common stock was artificially manipulated throughout the Class Period.  In ignorance of the purposeful scheme designed to create the illusion of the unpredictability of revenue growth, which was concealed by the Defendants, Plaintiff and the other members of the Class purchased Issuer securities at artificially manipulated prices, justifiably relying upon the false and misleading reports, releases and financial statements and were damaged thereby.

264.    Had Plaintiff and the other members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the securities of Issuer at all or, if so, not at the artificially manipulated prices they did.

265.    By virtue of the foregoing, the defendants each violated Florida Blue Sky Law, F.S.A. Section 517.301.

266.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Issuers' securities during the Class period.

## FIFTHTEENTH CLAIM:  FOR NEGLIGENT MISREPRESENTATION
## (BY PLAINTIFF AGAINST ALL DEFENDANTS)

267.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

268.    With respect to the information provided to Plaintiff and other members of the Class about the Issuers, Defendants owed Plaintiff and other members of the Class a duty of reasonable care.  Defendants knew that Plaintiff and the other members of the Class were relying upon the

62

misrepresentations set forth in the Prospectuses about each Issuer's performance and financial condition in assessing whether to purchase each Issuer's stock.

269.     In order to induce plaintiff and other members of the Class to purchase the stock, Defendants made the misrepresentations and material omissions specified herein.

270.     In fact, these representations were false in material respects, and Defendants knew they were false or would have known they were false had they exercised reasonable care.

271.     Moreover, Defendants knew that the Plaintiff and other members of the Class would rely upon these false representations and omissions in assessing whether to purchase each Issuer's stock.

272.     Plaintiff and the other members of the Class relied reasonably relied on Defendants' misrepresentations and material omissions, as they had no cause to believe that the Prospectus contained materially false and misleading statements, and omissions of material fact.

273.     As a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiff and the other members of the Class have been damaged.  They would not have purchased Issuers' stock but for the false statements and omissions of Defendants.

## PRAYER FOR JUDGMENT AND RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

1. Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs as representatives of the Class;

2. Awarding compensatory damages against Defendants individually, jointly and severally in an amount not yet fully ascertained, which when determined with sufficient specificity will be alleged and proved at trial;

63

3. Prejudgment interest at the maximum rate allowable by law;

4. Enjoining Defendants' wrongful conduct;

5. Awarding to Plaintiff and the Class Members disgorgement of Defendants' profits and commissions;

6. Awarding Plaintiff her costs and disbursements and reasonable allowances for Plaintiff's counsels' and experts', fees and expenses;

7. Awarding Plaintiffs and the Class Members restitution and rescission as permitted by law;

8. Punitive damages in an amount to be determined at trial;

9. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial pursuant to Federal Rules of Civil Procedure Rule 38(b).

Dated: 2/28/03

Dexter W. Lehtinen
Claudio Riedi
Lehtinen Vargas & Riedi, P.A.
7700 N. Kendall Drive, Suite 303
Miami, Florida 33156
(305) 279-1166 Telephone
(305) 279-1365 Facsimile
criedi@lehtinenlaw.com

Dated: 2/28/03

Charles M. Jung (*pro hac vice* admission
to be applied for)
41 Sutter Street #1470
San Francisco, California 94104
(877) 891-0342 Telephone
(801) 730-5516 Facsimile
seclaw@ureach.com

Attorneys for Plaintiffs

# EXHIBIT A: Subclass Periods and IPO Dates

**Exhibit A: Subclass Periods and IPO Dates**
(Note: Subclass Periods do not include purchasers in the IPO)

| Subclass Period | Name | TICKER | IPO Prospectus Date | Subclass Period Begins | Subclass Period Ends |
|---|---|---|---|---|---|
| 1 | Accelerated Networks Inc. | ACCL | 6/22/2000 | 6/23/2000 | 1/8/2001 |
| 2 | Airspan Networks, Inc. | AIRN | 7/19/2000 | 7/20/2000 | 1/31/2001 |
| 3 | @Road Inc. | ARDI | 9/28/2000 | 9/29/2000 | 2/15/2001 |
| 4 | AvantGo Inc. | AVGO | 9/27/2000 | 9/27/2000 | 7/24/2001 |
| 5 | Autoweb.com Inc. | AWEB | 3/22/1999 | 3/23/1999 | 7/21/2000 |
| 6 | Bsquare Corp. | BSQR | 10/19/1999 | 10/20/1999 | 7/6/2001 |
| 7 | CacheFlow Inc. | CFLO | 11/18/1999 | 11/19/1999 | 1/31/2001 |
| 8 | Clarent Corp. | CLRN | 7/1/1999 | 7/1/1999 | 4/20/2001 |
| 9 | Commerce One, Inc. | CMRC | 7/1/1999 | 7/1/1999 | 4/4/2001 |
| 10 | Corillian Corp. | CORI | 4/12/2000 | 4/12/2000 | 4/24/2001 |
| 11 | Centillium Communications | CTLM | 5/23/2000 | 5/24/2000 | 5/11/2001 |
| 12 | Digital Impact, Inc | DIGI | 11/22/1999 | 11/23/1999 | 1/31/2001 |
| 13 | e Machines Inc. | EEEE | 3/24/2000 | 3/24/2000 | 6/19/2000 |
| 14 | Efficient Networks Inc. | EFNT | 7/14/1999 | 7/15/1999 | 1/2/2001 |
| 15 | E.piphany Inc. | EPNY | 9/21/1999 | 9/22/1999 | 3/2/2001 |
| 16 | Evolve Software Inc. | EVLV | 8/9/2000 | 8/10/2000 | 4/25/2001 |
| 17 | Handspring Inc. | HAND | 6/20/2000 | 6/21/2000 | 3/27/2001 |
| 18 | ImproveNet Inc. | IMPV | 3/15/2000 | 3/16/2000 | 7/28/2000 |
| 19 | Informatica Corp. | INFA | 4/28/1999 | 4/29/1999 | 7/2/2001 |
| 20 | InterNAP Network Services Corp. | INAP | 9/29/1999 | 9/29/1999 | 3/5/2001 |
| 21 | iPrint.com Inc. | IPRT | 3/7/2000 | 3/8/2000 | 10/16/2000 |
| 22 | Intraware | ITRA | 2/25/1999 | 2/26/1999 | 9/25/2000 |
| 23 | InterTrust Technologies | ITRU | 10/26/1999 | 10/27/1999 | 6/27/2000 |
| 24 | Interwoven Inc. | IWOV | 10/7/1999 | 10/8/1999 | 4/18/2001 |
| 25 | Luminent Inc. | LMNE | 11/9/2000 | 11/10/2000 | 7/6/2001 |
| 26 | Lante Corp. | LNTE | 2/10/2000 | 2/11/2000 | 10/3/2000 |
| 27 | VA Linux Systems | LNUX | 12/9/1999 | 12/9/1999 | 11/6/2000 |
| 28 | Lightspan Partnership Inc. | LSPN | 2/10/2000 | 2/10/2000 | 8/16/2000 |
| 29 | McData Corp. | MCDT | 8/9/2000 | 8/9/2000 | 3/9/2001 |
| 30 | MultiLink Technology Corp. | MLTC | 6/20/2001 | 6/21/2001 | 10/23/2001 |
| 31 | MP3.COM Inc. | MPPP | 7/21/1999 | 7/21/1999 | 10/20/2000 |
| 32 | Numerical Technologies | NMTC | 4/7/2000 | 4/7/2000 | 1/16/2002 |
| 33 | New Focus Inc. | NUFO | 5/17/2000 | 5/18/2000 | 3/6/2001 |
| 34 | Novatel Wireless Inc. | NVTL | 11/15/2000 | 11/16/2000 | 3/29/2001 |
| 35 | Onvia.com Inc. | ONVI | 2/29/2000 | 3/1/2000 | 12/19/2000 |
| 36 | Onyx Software Corp. | ONXS | 2/11/1999 | 2/12/1999 | 1/31/2001 |
| 37 | Razorfish Inc. | RAZF | 4/26/1999 | 4/27/1999 | 10/5/2000 |
| 38 | Retek Inc. | RETK | 11/17/1999 | 11/18/1999 | 4/19/2001 |
| 39 | ScreamingMedia Inc. | SCRM | 8/2/2000 | 8/3/2000 | 2/8/2001 |
| 40 | Silicon Image | SIMG | 10/5/1999 | 10/6/1999 | 10/19/2000 |
| 41 | Selectica Inc. | SLTC | 3/9/2000 | 3/10/2000 | 3/2/2001 |

| 42 | Simplex Solutions Inc. | SPLX | 5/2/2001 | 5/2/2001 | 10/24/2001 |
| 43 | Support.com Inc. | SPRT | 7/18/2000 | 7/19/2000 | 4/19/2001 |
| 44 | Tanning Technology Corp. | TANN | 7/22/1999 | 7/23/1999 | 7/5/2000 |
| 45 | Tickets.com | TIXX | 11/3/1999 | 11/4/1999 | 6/26/2000 |
| 46 | Tumbleweed Communications Corp. | TMWD | 8/5/1999 | 8/6/1999 | 10/18/2000 |
| 47 | Triton Network Systems | TNSI | 7/12/2000 | 7/13/2000 | 11/14/2000 |
| 48 | Viant Corp. | VIAN | 6/17/1999 | 6/18/1999 | 8/31/2000 |
| 49 | Vitria Technology Inc. | VITR | 9/16/1999 | 9/17/1999 | 1/31/2001 |
| 50 | Virata Corp. | VRTA | 11/16/1999 | 11/17/1999 | 10/26/2000 |

**EXHIBIT B: Secondary Offerings**

**Exhibit B:  Secondary Offerings**

| ISSUER NAME | TICKER | Prospectus Date for Secondary Offering |
|---|---|---|
| Clarent Corp. | CLRN | 11/22/1999 |
| Efficient Networks Inc. | EFNT | 2/2/2000 |
| Informatica Corp. | INFA | 9/27/2000 |
| InterNAP Network Services Corp. | INAP | 4/6/2000 |
| InterTrust Technologies | ITRU | 4/6/2000 |
| Interwoven Inc. | IWOV | 1/26/2000 |
| New Focus Inc. | NUFO | 8/10/2000 |
| Tumbleweed Communications Corp. | TMWD | 7/26/2000 |
| Viant Corp. | VIAN | 12/7/1999 |
| Vitria Technology Inc. | VITR | 2/11/2000 |

# EXHIBIT C: Misstatements and Omissions in Each Issuer's Prospectus

**EXHIBIT C: Misstatements and Omissions in Each Issuer's Prospectus**

| Issuer Name | Accelerated Networks |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, UBS Warburg LLC, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | June 22, 2000 |
| **Page Number** | 76-77 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included:<br><br>* the information set forth in this prospectus and otherwise available to the underwriters;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management; the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly-traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Airspan Networks Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Deutsche Banc Alex. Brown, Lehman Brothers, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | July 19, 2000 |
| **Page Number** | 71-72 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiations between us and the representatives. The principal factors considered in determining the public offering price included:<br><br>• the information set forth in this prospectus and otherwise available to the representatives<br>• the history and the prospects for the industry in which we compete<br>• the ability of our management<br>• the prospects for our future earnings<br>• the present state of our development and our current financial condition<br>• the general condition of the securities markets at the time of this offering<br>• the recent market prices of, and the demand for, publicly-traded common stock of generally comparable companies |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **At Road Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | September 28, 2000 |
| **Page Number** | 65 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included the following:<br><br>. the information set forth in this prospectus and otherwise available to the representatives;<br>. market conditions for initial public offerings;<br>. the history and the prospects for the industry in which we will compete;<br>. the ability of our management;<br>. our prospects for future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Avantgo Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Merrill Lynch & Co., CIBC World Markets |
| **Prospectus Date** | September 27, 2000 |
| **Page Number** | 71-72 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the representatives. The principal factors to be considered in determining the public offering price include the following:<br><br>. the information included in this prospectus and otherwise available to the representatives;<br>. market conditions for initial public offerings;<br>. the history and the prospects for the industry in which we compete;<br>. the ability of our management;<br>. the prospects for our future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Autoweb.com Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Hambrecht & Quist, BancBoston Robertson Stephens, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | March 22, 1999 |
| **Page Number** | 143 |
| **Fraudulent Statement** | The principal factors to be considered in determining the public offering price include: the information set forth in this prospectus and otherwise available to the underwriters; the history and the prospects for the industry in which we will compete; the ability of our management; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | BSquare |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Lehman Brothers, A.G. Edwards & Sons, Inc., Wit Capital Corporation |
| **Prospectus Date** | October 19, 1999 |
| **Page Number** | 64 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters and does not reflect the market price of the common stock following the offering. The principal factors that were considered in determining the public offering price include:<br>* the information in this prospectus and otherwise available to the underwriters;<br>* market conditions for initial public offerings;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>* the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Cacheflow Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Morgan Stanley Dean Witter, Credit Suisse First Boston, Dain Rausher Wessels |
| **Prospectus Date** | November 18, 1999 |
| **Page Number** | 15 |
| **Fraudulent Statement** | Prior to this offering, you could not buy or sell our common stock publicly. An active public market for our common stock may not develop or be sustained after this offering. The initial public offering price was negotiated and determined with the representatives of the underwriters based on several factors. This price may vary from the market price of the common stock after this offering. The market price of the common stock may fluctuate significantly in response to the following factors:<br>. variations in our quarterly operating results;<br>. changes in financial estimates or investment recommendations by securities analysts;<br>. changes in market valuations of Internet-related and networking companies;<br>. announcements by us or our competitors of significant contracts, acquisitions, strategic partnerships, joint ventures or capital commitments;<br>. loss of a major customer;<br>. additions or departures of key personnel; and<br>. fluctuations in stock market prices and volumes. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Clarent Corp** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, BancBoston Robertson Stephens, Thomas Weisel Partners LLC, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | July 1, 1999 |
| **Page Number** | 64 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the representatives. The principal factors to be considered in determining the public offering price include:<br><br>. the information set forth in this prospectus and otherwise available to the representatives;<br>. the history and the prospects for the industry in which we will    compete;<br>. the ability of our management;<br>. our prospects for future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Commerce One Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Donaldson, Lufkin & Jenrette, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | July 1, 1999 |
| **Page Number** | 71 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiation between the representatives and us. The principal factors considered in determining the public offering price included:<br><br>- the information in this prospectus and available to the representatives;<br>- the history and the prospects for the industry in which we will compete;<br>- our management's ability;<br>- the prospects for our future earnings;<br>- the present state of our development and our current financial condition;<br>- the general condition of the securities markets at the time of this offering; and<br>- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Corillian Corp.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, Donaldson, Lufkin & Jenrette, Friedman Billings Ramsey |
| **Prospectus Date** | April 12, 2002 |
| **Page Number** | 63-64 |
| **Fraudulent Statement** | Before this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters and does not reflect the market price of the common stock following the offering. The principal factors considered in determining the public offering price include:<br>• the information in this prospectus and otherwise available to the underwriters;<br>• market conditions for initial public offerings;<br>• the history and the prospects for the industry in which we will compete;<br>• the ability of our management;<br>• the prospects for our future earnings; present state of our development and our current financial condition;<br>• the general condition of the securities markets at the time of this offering; and<br>• the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Centillium Communications, Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, Salomon Smith Barney |
| **Prospectus Date** | May 23, 2000 |
| **Page Number** | 54 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price will be determined by negotiation between us and the underwriters. The principal factors to be considered in determining the public offering price include: <br> * the information in this prospectus and otherwise available to the underwriters; <br> * the history and the prospects for the industry in which we will compete; <br> * the ability of our management; <br> * the prospects for our future earnings; <br> * the present state of our development and our current financial condition; <br> * the general condition of the securities markets at the time of this offering; and <br> * the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Digital Impact** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Hambrecht & Quist, Donaldson, Lufkin & Jenrette, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | November 22, 1999 |
| **Page Number** | 60 |
| **Fraudulent Statement** | Before this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the underwriters. The principal <br> factors to be considered in determining the public offering price include: <br> * the information included in this prospectus and otherwise available to the underwriters; <br> * the history and the prospects for the industry in which we will compete; <br> * the ability of our management; <br> * the prospects for our future earnings; <br> * the present state of our development and our current financial condition; <br> * the general condition of the securities markets at the time of this offering; and <br> * the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | eMachines |
| --- | --- |
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, Roberston Stephens, Salomon Smith Barney |
| **Prospectus Date** | March 24, 2000 |
| **Page Number** | 70 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included:<br>. the information in this prospectus and otherwise available to the underwriters;<br>. the history and the prospects for the industry in which we will compete;<br>. the ability of our management;<br>. the prospects for our future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Efficient Networks Inc |
| --- | --- |
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, BancBoston Robertson Stephens, Volpe Brown Whelan & Company |
| **Prospectus Date** | July 14, 1999 |
| **Page Number** | 68 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price has been determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included: the information set forth in this prospectus and otherwise available to the representatives; the history and the prospects for the industry in which we will compete; the ability of our management; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly-traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | E Piphany Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Hambrecht & Quist, Merrill Lynch & Co. |
| **Prospectus Date** | September 21, 1999 |
| **Page Number** | 68 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for our common stock. The initial public offering price for the common stock was determined by negotiation between the representatives and us and does not reflect the market price of the common stock following the offering. Among the principal factors considered in determining the initial public offering price were: <br> - the information in this prospectus and otherwise available to the representatives <br> - market conditions for initial public offerings <br> - the history of and prospects for the industry in which we will compete <br> - the ability of our management <br> - our prospects for our future earnings <br> - the present state of our development and our current financial condition <br> - the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies, and <br> - the general condition of the securities markets at the time of this offering |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Evolve |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston Deutsche Banc Alex. Brown, Wit SoundView |
| **Prospectus Date** | August 9, 2000 |
| **Page Number** | 71 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included: <br> • the information set forth in this prospectus and otherwise available to the underwriters; <br> • the history and the prospects for the industry in which we compete; <br> • the ability of our management; <br> • the prospects for our future earnings; <br> • the present state of our development and our current financial condition; <br> • the general condition of the securities markets at the time of this offering; and <br> • the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Handspring |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Merrill Lynch & Co., Donaldson, Lufkin & Jenrette, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | June 20, 2000 |
| **Page Number** | 60 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price include:<br>* the information set forth in this prospectus and otherwise available to the underwriters;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | ImproveNet |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, E*OFFERING |
| **Prospectus Date** | March 15, 2000 |
| **Page Number** | 73 |
| **Fraudulent Statement** | Before this offering, there has been no public market for our common stock. The initial public offering price will be determined by negotiation between us and the representatives. The principal<br>factors to be considered in determining the public offering price include:<br>• the information in this prospectus or available to the representatives;<br>• the history of and the prospects for the industry in which we will compete;<br>• the ability of our management;<br>• our prospects for future earnings;<br>• the present state of our development and our current financial condition;<br>• the general condition of the securities markets at the time of this offering; and<br>• the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Informatica Corp** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, BANCBOSTON ROBERTSON STEPHENS, SOUNDVIEW TECHNOLOGY GROUP, FAC/EQUITIES |
| **Prospectus Date** | April 28, 1999 |
| **Page Number** | 67 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors to be considered in determining the public offering price include: the information set forth in this prospectus and otherwise available to the underwriters; the history and the prospects for the industry in which we will compete; the ability of our management; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **InterNAP Network Services Corp** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | MORGAN STANLEY DEAN WITTER, CREDIT SUISSE FIRST BOSTON, DONALDSON, LUFKIN & JENRETTE, HAMBRECHT & QUIST |
| **Prospectus Date** | September 29, 1999 |
| **Page Number** | 69 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The public offering price for the shares of common stock has been determined by negotiations between us and the representatives of the underwriters. Among the factors considered in determining the public offering price were our record of operations, our current financial position and future prospects and our industry in general, the experience of our management, sales, earnings and certain of our other financial and operating information in recent periods, the price-earnings ratios, price-sales ratios, market prices of securities and certain financial and operating information of companies engaged in activities similar to ours. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | iPrint.com |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, U.S. Bancorp Piper Jaffray, WR Hambrecht + Co |
| **Prospectus Date** | March 7, 2000 |
| **Page Number** | 70 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included the following:<br>• the information included in this prospectus and otherwise available to the representatives;<br>• market conditions for initial public offerings;<br>• the history and the prospects for the industry in which we will compete;<br>• the ability of our management;<br>• the prospects for our future earnings;<br>• the present state of our development and our current financial condition;<br>• the general condition of the securities markets at the time of this offering; and<br>• the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Intraware |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, BancBoston Robertson Stephens, Hambrecht & Quist |
| **Prospectus Date** | February 25, 1999. |
| **Page Number** | 63 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price has been determined by negotiation between Intraware and the Representatives. The principal factors considered in determining the public offering price included: the information set forth in this prospectus and otherwise available to the representatives; the history and the prospects for the industry in which Intraware will compete; the ability of Intraware's management; the prospects for future earnings of Intraware; the present state of Intraware's development and its current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | InterTrust Technologies Corp. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, J.P. Morgan & Co., Salomon Smith Barney, SoundView Technology Group |
| **Prospectus Date** | October 26, 1999 |
| **Page Number** | 72 |
| **Fraudulent Statement** | Before this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between the representatives and us. The principal factors considered in determining the public offering price included:<br><br>. the information in this prospectus or available to the underwriters;<br>. the history and the prospects for the industry in which we will     compete;<br>. the ability of our management;<br>. the prospects for our future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this     offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Interwoven Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, Dain Rauscher Wessels a division of Dain Rauscher Incorporated |
| **Prospectus Date** | October 7, 1999 |
| **Page Number** | 66 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included:<br><br>. the information set forth in this prospectus and otherwise available to the underwriters;<br>. the history and the prospects for the industry in which we will compete;<br>. the ability of our management;<br>. the prospects for our future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this     offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Luminent Inc. |
|---|---|
| Report Title | Prospectus |
| Author(s) | CREDIT SUISSE FIRST BOSTON, CIBC WORLD MARKETS, ROBERTSON STEPHENS, U.S. BANCORP PIPER JAFFRAY, FIRST SECURITY VAN KASPER |
| Prospectus Date | November 9, 2000 |
| Page Number | 83 |
| Fraudulent Statement | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the offering price included:<br>- the information in this prospectus and otherwise available to the underwriters;<br>- the history and the prospects for the industry in which we will compete;<br>- the ability of our management;<br>- the prospects for our future earnings;<br>- the present state of our development and our current financial condition;<br>- the general condition of the securities markets at the time of this offering; and |
| Reason Why Fraudulent | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Lante Corporation |
|---|---|
| Report Title | Prospectus |
| Author(s) | Credit Suisse First Boston, Deutsche Banc Alex. Brown, Thomas Weisel Partners LLC, Friedman Billings Ramsey |
| Prospectus Date | February 10, 2000 |
| Page Number | 60-61 |
| Fraudulent Statement | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the representatives, and may not reflect the market price for our common stock that may prevail following this offering. We considered, among others, the following principal factors in determining the initial public offering price:<br>* the information in this prospectus and otherwise available to the representatives;<br>* market conditions for initial public offerings;<br>* the history of and prospects for the industry in which we will compete;<br>* our past and present operations;<br>* our past and present earnings and current financial position;<br>* the ability of our management;<br>* our prospects for future earnings;<br>* the present state of our development and our current financial    condition;<br>* the recent prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>* the general condition of the securities markets at the time of this offering. |
| Reason Why Fraudulent | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | VA Linux Systems Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, DEUTSCHE BANC ALEX. BROWN, HAMBRECHT & QUIST, LEHMAN BROTHERS |
| **Prospectus Date** | December 9, 1999 |
| **Page Number** | 68 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price will be determined by negotiation between us and the underwriters. The principal factors to be considered in determining the public offering price include:<br>- the information in this prospectus and otherwise available to the underwriters;<br>- the history and the prospects for the industry in which we will compete;<br>- the ability of our management;<br>- the prospects for our future earnings;<br>- the present state of our development and our current financial condition;<br>- the general condition of the securities markets at the time of this offering; and<br>- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Lightspan Partnership, Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, THOMAS WEISEL PARTNERS LLC, U.S. BANCORP PIPER JAFFRAY |
| **Prospectus Date** | February 10, 2000 |
| **Page Number** | 79 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the representatives. The principal factors to be considered in determining the public offering price include the following:<br>- the information included in this prospectus and otherwise available to the representatives;<br>- market conditions for initial public offerings;<br>- the history of, and the prospects for, the industry in which we will compete;<br>- the ability of our management;<br>- the prospects for our future earnings;<br>- the present state of our development and our current financial condition;<br>- the general condition of the securities markets at the time of this offering; and<br>- the recent market prices of, and the demand for, publicly-traded common stock of companies that are generally comparable to us. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | McData |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Deutsche Banc Alex. Brown, Merrill Lynch & Co. |
| **Prospectus Date** | August 9, 2000 |
| **Page Number** | 84 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the Class B common stock. The initial public offering price has been determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included:<br>* the information set forth in this prospectus and otherwise available to the representatives;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly-traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | MultiLink Technology Corp |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Salomon Smith Barney, Thomas Weisel Partners LLC |
| **Prospectus Date** | June 20, 2001 |
| **Page Number** | 70-71 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our Class A common stock. The initial public offering price will be determined by negotiation between us and the underwriters and will not necessarily reflect the market price of the Class A common stock following the offering. The principal factors that will be considered in determining the public offering price will include:<br>• the information in this prospectus and otherwise available to the underwriters;<br>• market conditions for initial public offerings;<br>• the history and the prospects for the industry in which we will compete;<br>• the ability of our management;<br>• the prospects for our future earnings;<br>• the present state of our development and our current financial condition;<br>• the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>• the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **MP3.COM Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, HAMBRECHT & QUIST, BANCBOSTON ROBERTSON STEPHENS, CHARLES SCHWAB & CO., INC. |
| **Prospectus Date** | July 21, 1999 |
| **Page Number** | 60 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the underwriters. The principal factors to be considered in determining the public offering price include the following: the information included in this prospectus and otherwise available to the representatives; market conditions for initial public offerings; the history and the prospects for the industry in which we will compete; the ability of our management; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | **Numerical Technologies, Inc.** |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, SG Cowen |
| **Prospectus Date** | April 7, 2000 |
| **Page Number** | 66 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for the common stock. The initial public offering price for the common stock was determined by negotiation between us and the representatives, and does not reflect the market price for the common stock following the offering. Among the principal factors considered in determining the initial public offering price was:<br>* the information in this prospectus and otherwise available to the representatives;<br>* market conditions for initial public offerings;<br>* the history of and prospects for the industry in which we will compete;<br>* the ability of our management;<br>* our prospects for future earnings;<br>* the present state of our development and our current financial condition;<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>* the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | New Focus |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, CHASE H&Q, U.S. BANCORP PIPER JAFFRAY, CIBC WORLD MARKETS |
| **Prospectus Date** | May 17, 2000 |
| **Page Number** | 17 |
| **Fraudulent Statement** | The initial public offering price will be determined based on negotiations between us and the representatives of the underwriters, based on factors that may not be indicative of future market performance |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Novatel Wireless |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, U.S. Bancorp Piper Jaffray, Banc of America Securities LLC |
| **Prospectus Date** | November 15, 2000 |
| **Page Number** | 74-75 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included the following:<br>* the information included in this prospectus and otherwise available to the representatives;<br>* market conditions for initial public offerings;<br>* the history and the prospects for the industry in which we compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our business development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Onvia.Com Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, Robertson Stephens, William Blair & Company, E*OFFERING |
| **Prospectus Date** | February 29, 2000 |
| **Page Number** | 67 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price was determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included the following:<br>. the information set forth in this prospectus and otherwise available to the representatives;<br>. market conditions for initial public offerings;<br>. the history and the prospects for the industry in which we will compete;<br>. the ability of our management;<br>. our prospects for future earnings;<br>. the present state of our development and our current financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Onyx Software Corp. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, SG Cowen, Piper Jaffray Inc. |
| **Prospectus Date** | February 11, 1999 |
| **Page Number** | 62 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock.  The initial public offering price was determined by negotiation between ONYX and the representatives of the underwriters. The principal factors that were considered in determining the public offering price included: the information set forth in this prospectus and otherwise available to the representatives; the history and the prospects for the industry in which ONYX will compete; the ability of ONYX's management; the prospects for future earnings of ONYX; the present state of ONYX's development and its current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Razorfish |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, BancBoston Robertson Stephens, BT Alex. Brown, Lehman Brothers |
| **Prospectus Date** | April 26, 1999 |
| **Page Number** | 79 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for the Common Stock. The initial public offering price for the Common Stock has been determined by negotiation between us and the representatives, and does not reflect the market price for the Common Stock following the offering. Among the principal factors considered in determining the initial public offering price were:<br>* the information set forth in this prospectus and otherwise available to the representatives;<br>* market conditions for initial public offerings;<br>* the history of and prospects for the industry in which we will compete;<br>* our past and present operations;<br>* our past and present earnings and current financial position;<br>* the ability of our management;<br>* our prospects for future earnings;<br>* the present state of our development and our current financial condition;<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies;<br>* the general condition of the securities markets at the time of this offering; and<br>* other relevant factors. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Retek |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, U.S. Bancorp Piper Jaffray |
| **Prospectus Date** | November 17, 1999 |
| **Page Number** | 87 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price will be determined by negotiation between us and the underwriters. The principal factors that will be considered in determining the public offering price include:<br>* the information set forth in this prospectus and otherwise available to the underwriters;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | ScreamingMedia |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Deutsche Banc Alex. Brown, Thomas Weisel Partners LLC |
| **Prospectus Date** | August 2, 2000 |
| **Page Number** | 64 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the representatives, and may not reflect the market price for our common stock that may prevail following this offering. We will consider, among others, the following principal factors in determining the initial public offering price:<br>* the information in this prospectus and otherwise available to the representatives;<br>* market conditions for initial public offerings;<br>* the history of and prospects for the industry in which we will compete;<br>* our past and present operations;<br>* our past and present earnings and current financial position;<br>* the ability of our management;<br>* our prospects for future earnings;<br>* the present state of our development and our current financial condition;<br>* the recent prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>* the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Silicon Image Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | CREDIT SUISSE FIRST BOSTON, ROBERTSON STEPHENS, DAIN RAUSCHER WESSELS a division of Dain Rauscher Incorporated |
| **Prospectus Date** | October 5, 1999 |
| **Page Number** | 73 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for the common stock. The initial public offering price for the common stock has been determined by negotiation between us and the representatives, and may not reflect the market price for the common stock following this offering. Among the principal factors considered in determining the initial public offering price of our common stock were:<br>- the information in this prospectus and otherwise available to the representatives;<br>- market conditions for initial public offerings;<br>- the history of and prospects for the industry in which we will compete;<br>- the ability of our management;<br>- our prospects for future earnings, the present state of our development and our current financial condition;<br>- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies;<br>- the general condition of the securities markets at the time of this offering and other relevant factors. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Selectica |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Thomas Weisel Partners LLC, U.S. Bancorp Piper Jaffray E*OFFERING |
| **Prospectus Date** | March 9, 2000 |
| **Page Number** | 77-78 |
| **Fraudulent Statement** | Before this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included:<br>* the information set forth in this prospectus and otherwise available to the underwriters;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Simplex Solutions Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Robertson Stephens, SG Cowen |
| **Prospectus Date** | May 2, 2001 |
| **Page Number** | 87-88 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for the common stock. The initial public offering price for the common stock was determined by negotiation between us and the underwriters, and does not reflect the market price for the common stock following the offering. The principal factors considered in determining the initial public offering price included:<br>* the information in this prospectus and otherwise available to the underwriters;<br>* market conditions for initial public offerings;<br>* the history of and prospects for the industry in which we will compete;<br>* the ability of our management;<br>* our prospects for future earnings;<br>* the present state of our development and our current financial condition;<br>* the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>* the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Support.Com Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Chase H&Q, Bear, Stearns & Co. Inc., Wit SoundView |
| **Prospectus Date** | July 18, 2000 |
| **Page Number** | 79 |
| **Fraudulent Statement** | Before this offering, there has been no public market for the common stock.  The initial public offering price was determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price include:<br>. the information included in this prospectus;<br>. market conditions for initial public offerings;<br>. the history and the prospects for the industry in which we will compete;<br>. the ability of our management;<br>. our prospects for our future earnings;<br>. the present state of our development and our financial condition;<br>. the general condition of the securities markets at the time of this offering; and<br>. the recent market prices of, and the demand for, publicly traded   common stock of generally comparable companies |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Tanning Technology Corp. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Salomon Smith Barney, CIBC World Markets, ING Barings, Adams, Harkness & Hill, Inc. |
| **Prospectus Date** | July 12, 1999 |
| **Page Number** | 67 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiation between us and the representatives, and does not reflect the market price for our common stock following this offering. Among the principal factors considered in determining the initial public offering price were:<br>. the information in this prospectus and otherwise available to the representatives;<br>. market conditions for initial public offerings;<br>. the history of and prospects for the industry in which we will compete;<br>. our past and present operations;<br>. our past and present earnings and current financial position;<br>. the ability of our management;<br>. our prospects for future earnings;<br>. the present state of our development and our current financial condition;<br>. the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies;<br>. the general condition of the securities markets at the time of this offering; and<br>. other relevant factors. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Tickets.com |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | MORGAN STANLEY DEAN WITTER, CREDIT SUISSE FIRST BOSTON, SG COWEN, MORGAN STANLEY DEAN WITTER ONLINE, E*OFFERING, WIT CAPITAL CORPORATION |
| **Prospectus Date** | November 5, 1999 |
| **Page Number** | 96 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for the common stock. The initial public offering price has been determined by negotiations between Tickets.com and the representatives of the underwriters.  Among the factors considered in determining the initial public offering price were:<br>• the future prospects of Tickets.com and its industry in general;<br>• sales, earnings and other financial and operating information of Tickets.com in recent periods; and<br>• the price-earnings ratios, price-sales ratios, market prices of securities and other financial and operating information of companies engaged in activities similar to those of Tickets.com. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Tumbleweed Communications |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Hambrecht & Quist, ING Barings |
| **Prospectus Date** | August 5, 1999 |
| **Page Number** | 67 |
| **Fraudulent Statement** | Before this offering, there has been no public market for our common stock. The initial public offering price has been determined by negotiation between the representatives and us. The principal factors considered in determining the public offering price included: the information in this prospectus and available to the representatives; the history and the prospects for the industry in which we will compete; our management's ability; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Triton Network Systems |
|---|---|
| Report Title | Prospectus |
| Author(s) | Credit Suisse First Boston, Deutsche Banc Alex. Brown, U.S. Bancorp Piper Jaffray |
| Prospectus Date | July 12, 2000 |
| Page Number | 68 |
| Fraudulent Statement | Prior to this offering, there has been no public market for the common stock. The initial public offering price has been determined by negotiation between us and the representatives. The principal factors considered in determining the public offering price included:<br>* the information set forth in this prospectus and otherwise available to the representatives;<br>* the history and the prospects for the industry in which we will compete;<br>* the ability of our management;<br>* the prospects for our future earnings;<br>* the present state of our development and our current financial condition;<br>* the general condition of the securities markets at the time of this offering; and<br>* the recent market prices of, and the demand for, publicly-traded common stock of generally comparable companies. |
| Reason Why Fraudulent | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Viant Corp. |
|---|---|
| Report Title | Prospectus |
| Author(s) | GOLDMAN, SACHS & CO., CREDIT SUISSE FIRST BOSTON, WIT CAPITAL CORPORATION, FACILITATOR OF INTERNET DISTRIBUTION |
| Prospectus Date | June 17, 1999 |
| Page Number | 164 |
| Fraudulent Statement | The initial public offering price was negotiated among Viant and the representatives. Among the factors considered in determining the initial public offering price of the shares, in addition to prevailing market conditions, were Viant's historical performance, estimates of the business potential and earnings prospects of Viant, an assessment of Viant's management and the consideration of the above factors in relation to market valuation of companies in related businesses. |
| Reason Why Fraudulent | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

| Issuer Name | Vitria Technology Inc. |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Merrill Lynch & Co., BancBoston Robertson Stephens, SoundView Technology Group |
| **Prospectus Date** | September 16, 1999 |
| **Page Number** | 60 |
| **Fraudulent Statement** | Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiation between us and the underwriters. The principal factors considered in determining the public offering price included: the information set forth in this prospectus and otherwise available to the underwriters; the history and the prospects for the industry in which we will compete; the ability of our management; the prospects for our future earnings; the present state of our development and our current financial condition; the general condition of the securities markets at the time of this offering; and the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |


| Issuer Name | Virata Corporation |
|---|---|
| **Report Title** | Prospectus |
| **Author(s)** | Credit Suisse First Boston, Warburg Dillon Read LLC, Thomas Weisel Partners LLC |
| **Prospectus Date** | November 16, 1999 |
| **Page Number** | 77 |
| **Fraudulent Statement** | Prior to the offering, there has been no public market for the common stock. The initial public offering price for the common stock has been determined by negotiation between us and the representatives, and may not reflect the market price for the common stock following this offering. The principal factors considered in determining the initial public offering price of our common stock were:<br>• the information in this prospectus and otherwise available to the representatives;<br>• market conditions for initial public offerings;<br>• the history of and prospects for the industry in which we will compete;<br>• the ability of our management;<br>• our prospects for future earnings, the present state of our development and our current financial condition;<br>• the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and<br>• the general condition of the securities markets at the time of this offering. |
| **Reason Why Fraudulent** | The IPO pricing was inaccurate; in addition, CSFB's sales staff had disclosed this fact to select members of the investing public. |

# EXHIBIT D: Misstatements and Omissions in CSFBC's Research Reports

**Exhibit D: Misstatements and Omissions in CSFBC's Research Reports**

| Issuer Name | Accelerated Networks (ACCL) |
|---|---|
| Report Title | Q2:00 Results in Line; Despite Book-to-Bill Slightly Below 1.0 Visibility Good Entering H2:00 |
| Author(s) | James P. Parmelee, Monica M. Matyjaskiewicz, Leslie D. Mallon, Steve M. Edney |
| Date of Statement | July 27, 2000 |
| Page Number | 5 |
| Fraudulent Statement | Accelerated Networks (ACCL)<br>Historical and Projected Income Statement<br>(5 in thousands, except per share data, fiscal year ends December 31) |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |

| Issuer Name | Airspan Networks (AIRN) |
|---|---|
| Report Title | More Orders Announced |
| Author(s) | Marc A. Cabi, Randy Abrams, Tim Long |
| Date of Statement | October 20, 2000 |
| Page Number | 5 |
| Fraudulent Statement | Exhibit 3<br>Airspan Quarterly Operating Results<br>$ in thousands, except per share data |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |

| Issuer Name | At Road Inc (ARDI) |
|---|---|
| Report Title | Fourth Quarter Preview |
| Author(s) | Marc A. Cabi, Randy Abrams, Mike Harden |
| Date of Statement | February 14, 2001 |
| Page Number | 2 |
| Fraudulent Statement | Exhibit 1<br>@Road Quarterly Operating Results<br>$ in thousands, except per share data |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |

| Issuer Name | AvantGo (AVGO) |
|---|---|
| Report Title | AvantGo Reports Solid Quarter—In Tough Conditions |
| Author(s) | Todd Raker, Suji DeSilva, Kristen Bartholdson |
| Date of Statement | April 25, 2001 |
| Page Number | 7 |

| Fraudulent Statement | Exhibit 5<br>Historical and Projected Quarterly Income Statement, FY2000A–2001E<br>$ in millions, except per-share data |
|---|---|
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |

| **Issuer Name** | **Autoweb.com (AWEB)** |
|---|---|
| Report Title | Auto Sales Slow in May, Shares Far Below Fair Value |
| Author(s) | Lise Buyer, Tracey Ford, Heath Terry |
| Date of Statement | June 6, 2000 |
| Page Number | 4 |
| Fraudulent Statement | Exhibit 2<br>AutoWeb.com<br>(in millions of $US, except per share data)<br>FY-DEC |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |

| **Issuer Name** | **Bsquare (BSQR)** |
|---|---|
| Report Title | Bsquare reported higher-than-expected Q499 EPS of $0.02 on above-forecast revenue, as CE market appeared to gain momentum. We're raising our 2000 revenue and earnings forecast |
| Author(s) | Michael Kwatinetz, Hans Roderich, Jake Hindelong, Peter Nurnberg |
| Date of Statement | January 28, 2000 |
| Page Number | 4 |

| Fraudulent Statement | **Bsquare Corp.**<br>Summary of Quarterly Earnings<br>Year Ending December 31<br>($Millions) |
|---|---|

| Revenue | 1998 | 1999 | 2000E | 2001E | % Increase | 1998 | 1999 | 2000E | 2001E |
|---|---|---|---|---|---|---|---|---|---|
| March | $5.49 | $8.81 | $11.82 | $15.63 | March | 201.1% | 60.4% | 34.1% | 32.2% |
| June | $5.31 | $9.73 | $12.53 | $16.56 | June | 76.8% | 83.3% | 28.7% | 32.2% |
| September | $6.58 | $10.03 | $13.65 | $17.89 | September | 46.0% | 52.5% | 36.1% | 31.0% |
| December | $7.23 | $11.36 | $14.88 | $19.32 | December | 42.5% | 57.1% | 31.0% | 29.8% |
| Total | $24.61 | $39.94 | $52.88 | $69.40 | Total | 70.9% | 62.3% | 32.4% | 31.2% |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| Report Title #2 | Assuming Coverage w/ Buy; Strong 1Q; Raising Ests. |
| Author(s) | Erach D. Desai |
| Date of Statement | April 28, 2000 |
| Page Number | 2 |

| | |
|---|---|
| **Fraudulent Statement** | CY00 revenues go to $55.0mm vs. $53.0mm previously. … 2Q revenues expected to be modestly up sequentially, despite blow-out 1Q. … CY01 revenues go to $72.0mm vs. $69.4mm previously. |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **CacheFlow Inc. (CFLO)** |
| **Report Title** | Caching In: Raising Price Target to $190 to Reflect Increasingly Upbeat Market Expectations |
| **Author(s)** | Amit Chopra, Andrew McCullough |
| **Date of Statement** | September 26, 2000 |
| **Page Number** | 6 |
| **Fraudulent Statement** | Exhibit 7 <br> CacheFlow Income Statement <br> $ in millions, except per share data <br><br> (income statement table — columns Q100A, Q200A, Q300A, Q400A, FY2000A, Q101A, Q201E, Q301E, Q401E, FY2001E; Revenue $3.6 $4.8 $8.0 $12.8 $29.3 $22.4 $31.4 $44.0 $61.6 $159.4) |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Clarent Corp. (CLRN)** |
| **Report Title** | Clarent Posts a Solid Quarter |
| **Author(s)** | Amit Chopra |
| **Date of Statement** | January 18, 2001 |
| **Page Number** | 2 |
| **Fraudulent Statement** | Exhibit 1 <br> Clarent Quarterly Income Statement <br> FYE December, $'s in millions <br><br> (income statement table) |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Commerce One (CMRC)** |
| **Report Title** | Downgrading to a Buy from a Strong Buy |
| **Author(s)** | John Byun, Erik Swords, Brent Thill, Ian W. Toll |
| **Date of Statement** | March 2, 2001 |
| **Page Number** | 3 |
| **Fraudulent Statement** | Commerce One <br> Income Statement <br> (data in thousands, except per share) <br><br> (income statement table) |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Corillian (CORI)** |
| **Report Title** | Corillian reports December quarter earnings; beats revenue estimates; ups guidance. |
| **Author(s)** | James Marks, Sam John, |
| **Date of Statement** | February 7, 2001 |

Clarent Quarterly Income Statement:

| | 2000(A) | | | | 2001(E) | | | | Full Year | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1A | Q2A | Q3A | Q4A | Q1E | Q2E | Q3E | Q4E | 2000(A) | 2001(E) |
| Revenue | $24.6 | $28.3 | $45.5 | $53.2 | $62.4 | $70.3 | $79.4 | $86.0 | $151.6 | $298.1 |

Commerce One Income Statement:

| | — FY2000 by Quarter — | | | | — FY2001E by Quarter — | | | | Fiscal Year Ends December | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar 00 | Jun 00 | Sep 00 | Dec 00 | Mar 01E | Jun 01E | Sep 01E | Dec 01E | 2000 | 2001E | 2002E |
| License revenue | 27,121 | 40,953 | 65,993 | 88,340 | 83,830 | 99,778 | 106,794 | 112,699 | 222,272 | 411,781 | 509,191 |
| Service revenue | 7,888 | 21,751 | 46,821 | 103,069 | 95,680 | 98,860 | 99,838 | 100,125 | 178,519 | 394,961 | 430,412 |
| Network revenue | — | — | — | — | 18,720 | 23,381 | 28,379 | 37,546 | — | 108,027 | 251,078 |
| Total revenue | 35,009 | 62,704 | 112,884 | 191,399 | 206,000 | 221,728 | 235,032 | 250,309 | $401,798 | $915,088 | $1,200,981 |

| Page Number | 4 |
|---|---|
| Fraudulent Statement | Exhibit 1<br>Income Statement<br><br>CORILLIAN INCOME STATEMENT |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Centillium (CTLM)** |
| Report Title | Three Words You Didn't Expect to Hear this Quarter— "Estimates Raised Significantly" |
| Author(s) | Charlie Glavin, CFA, Regina Eberhart |
| Date of Statement | April 18, 2001 |
| Page Number | 6 |
| Fraudulent Statement | Exhibit 1<br>Income Statement |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Digital Impact Inc. (DIGI)** |
| Report Title | Beats Estimates in the Face of eMeltdown. |
| Author(s) | Richard Petersen, Anthony Lorenzo |
| Date of Statement | October 18, 2000 |
| Page Number | 9 |
| Fraudulent Statement | Table 3<br>Digital Impact<br>Forecast |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **eMachines Inc. (EEEE)** |
| Report Title | More than a Low-End PC Company: Profitable Consumer Retail Sales Provide Basis for Internet Related Revenues |
| Author(s) | Joel Pitt |
| Date of Statement | May 12, 2000 |
| Page Number | 21 |

| Fraudulent Statement | **Table 17**<br>**eMachines: Statement of Quarterly Earnings 1998-2001E**<br>$ in millions, except per share data |

**Table 17**
**eMachines: Statement of Quarterly Earnings 1998-2001E**
$ in millions, except per share data

| | 1998 | 1999 | 2000E | 2001E | | 1998 | 1999 | 2000E | 2001E |
|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | | | | | **% Increase** | | | | |
| March | $0.0 | $137.4 | $249.8 | $315.4 | March | na | na | 81.8% | 26.2% |
| June | 0.0 | 213.9 | 201.3 | 301.4 | June | na | na | -5.9% | 49.7% |
| September | 0.0 | 155.9 | 262.5 | 346.8 | September | na | na | 68.4% | 32.1% |
| December | 58.3 | 307.1 | 381.3 | 432.3 | December | na | 427.0% | 24.2% | 13.4% |
| **Total** | $58.3 | $814.3 | $1,095.0 | $1,395.8 | **Total** | na | 1297.3% | 34.5% | 27.5% |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Efficient Networks (EFNT)** |
| **Report Title** | Solid FQ1:01 Results; Outlook Upbeat Paced by New Customer Momentum; Boosting Ests |
| **Author(s)** | James P. Parmelee, Monica M. Matyjaskiewicz, Steve M. Edney |
| **Date of Statement** | October 19, 2000 |
| **Page Number** | 6 |
| **Fraudulent Statement** | Efficient Networks<br>Historical and Projected Income Statement<br>($ in thousands, except per share data, fiscal year ends June 30) |

Efficient Networks
Historical and Projected Income Statement
($ in thousands, except per share data, fiscal year ends June 30)

| | F1999A | | | | F2000A | | | | F2001E | | | | F1999A | F2000A | F2001E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | 1QA | 2QA | 3QA | 4QA | 1QA | 2QE | 3QE | 4QE | | | |
| SALES | 1,174 | 1,850 | 4,115 | 7,689 | 12,371 | 26,424 | 61,749 | 101,899 | 127,226 | 154,000 | 186,000 | 224,000 | 14,828 | 202,243 | 691,226 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **E.Piphany (EPNY)** |
| **Report Title** | Q4 Ahead of Ests; New 911 of Customer Interaction |
| **Author(s)** | Brent Thill, John Torrey, |
| **Date of Statement** | January 26, 2001 |
| **Page Number** | 5 |
| **Fraudulent Statement** | E.piphany<br>In some fashion and<br>(data in thousands, except per share) |

E.piphany
In some fashion and
(data in thousands, except per share)

| | -- FY2000E by Quarter -- | | | | -- FY2001E by Quarter -- | | | | -- Year Ended December -- | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar 00 | Jun 00 | Sep 00 | Dec 00 | Mar 01E | Jun 01E | Sep 01E | Dec 01E | 1998 | 2000E | 2001E | 2002E |
| License revenue | 8,268 | 14,209 | 21,362 | 29,550 | 32,948 | 38,220 | 44,528 | 51,873 | 10,181 | 73,495 | 167,568 | 247,988 |
| Service revenue | 6,147 | 10,228 | 17,758 | 19,657 | 21,957 | 25,097 | 28,987 | 33,480 | 9,021 | 53,786 | 109,530 | 153,671 |
| Total revenue | 14,415 | 24,519 | 39,140 | 49,207 | 54,905 | 63,317 | 73,515 | 85,355 | $19,182 | $127,281 | $277,087 | $401,636 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Evolve Software, Inc. (EVLV)** |
| **Report Title** | The EDS Deal Likely Huge: Raising Estimates |
| **Author(s)** | Mark Wolfenberger, David Sturtz , Barry Chubrik |
| **Date of Statement** | March 6, 2001 |
| **Page Number** | 3 |

| | |
|---|---|
| **Fraudulent Statement** | Evolve Earnings Model FY00A-FY02E<br>$ in Millions, except per share data<br> |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Handspring (HAND)** |
| **Report Title** | 'EDGEing' into a new product category |
| **Author(s)** | Marc A. Cabi, Randy Abrams, Mike Harden |
| **Date of Statement** | March 13, 2001 |
| **Page Number** | 6 |
| **Fraudulent Statement** | Table 5<br>Handspring Income Statement 2000-2002<br> |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **ImproveNet (IMPV)** |
| **Report Title** | ImproveNet |
| **Author(s)** | Heath Terry, Lise Buyer |
| **Date of Statement** | July 11, 2000 |
| **Page Number** | 4 |
| **Fraudulent Statement** | Exhibit 2 - Quarterly Historical and Projected Income Statement 1999-2001<br> |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Informatica Corporation (INFA)** |
| **Report Title** | Announces Real-Time Analytics Product |
| **Author(s)** | Wendell H. Laidley, Marie A. Kluth |
| **Date of Statement** | June 26, 2001 |
| **Page Number** | 4 |
| **Fraudulent Statement** | Exhibit 1<br>Pro Forma Quarterly Income Statement, FY99A-01E<br>$ in thousands except per share data<br> |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **InterNAP Network Services Corp. (INAP)** |
| Report Title | Quarter In-Line with Expectations. No Change to 2001 Estimates - Reiterate Buy. |
| Author(s) | Todd Raker , Suji DeSilva, Kristen Bartholdson |
| Date of Statement | January 23, 2001 |
| Page Number | 10 |

Fraudulent Statement:

**Table 6**
**Projected Quarterly Income Statement, 1999–2000**
$ in millions, except per-share data

| (Fiscal Year Ends Dec.) | 2000A | | | | Full Year 2000A | 2001E | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3/31 | 6/30 | 9/30 | 12/31 | | 3/31E | 6/30E | 9/30E | 12/31E |
| Total Sales | $ 8.691 | $ 13.647 | $ 20.229 | $ 26.895 | $ 69.613 | $ 33.700 | $ 44.000 | $ 58.000 | $ 82.400 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **iPrint.com (IPRT)** |
| Report Title | Highlights from Q2 |
| Author(s) | Brent Thill |
| Date of Statement | July 18, 2000 |
| Page Number | 4 |

Fraudulent Statement: [table image, illegible]

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **(ITRA)** |
| Report Title | Reports Strong Q1 FY01; Revenues Beat Our Forecast, Losses Narrower Than Expected |
| Author(s) | Christopher E. Vroom, CFA, Nat Schindler, Brian Chin |
| Date of Statement | June 29, 2000 |
| Page Number | 4 |

Fraudulent Statement:

Intraware
(in millions of $US, except per share data)
FY = February

| | F2000 | | | | F2001 | | | | F2002 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1QA | 2QA | 3QA | 4QA | 1QE | 2QE | 3QE | 4QE | 1QE | 2QE | 3QE | 4QE |
| .Shop | 14.0 | 16.3 | 21.3 | 32.9 | 36.5 | 40.1 | 43.0 | 46.4 | 50.3 | 53.9 | 57.5 | 60.9 |
| Y/Y growth | 179.9% | 99.1% | 116.5% | 160.9% | 161.1% | 145.9% | 101.7% | 40.9% | 37.7% | 34.8% | 33.8% | 31.4% |
| Q/Q growth | 19.4% | 16.0% | 30.9% | 54.4% | 10.9% | 9.7% | 7.3% | 7.9% | 8.4% | 7.3% | 6.7% | 5.9% |
| % Total | 80.0% | 80.0% | 80.0% | 81.0% | 86.0% | 86.0% | 85.5% | 85.0% | 74.0% | 71.2% | 67.1% | 63.0% |
| COGS Shop | 12.4 | 13.99 | 17.26 | 28.75 | 31.93 | 34.76 | 37.40 | 40.36 | 43.86 | 47.01 | 50.10 | 52.98 |
| % shop revs | 91.0% | 90.9% | 81.0% | 97.4% | 87.5% | 86.8% | 87.0% | 87.0% | 87.2% | 87.1% | 87.0% | |
| % total | 97.1% | 98.1% | 90.7% | 98.3% | 97.4% | 98.9% | 90.4% | 98.1% | 94.4% | 93.7% | 92.9% | 92.7% |
| Service | 2.5 | 2.9 | 3.5 | 3.2 | 5.0 | 6.5 | 9.5 | 12.3 | 17.8 | 21.8 | 28.2 | 34.6 |
| Y/Y growth | | | 4460.9% | 138.9% | 100.4% | 127.9% | 176.0% | 279.0% | 258.7% | 233.4% | 160.0% | 181.9% |
| Q/Q growth | 18.2% | 16.9% | 20.9% | -8.3% | 53.1% | 31.9% | 46.0% | 29.8% | 43.7% | 23.7% | 79.1% | 22.9% |
| % Total | 19.0% | 19.0% | 19.0% | 9.9% | 12.0% | 14.0% | 18.2% | 20.9% | 26.0% | 28.8% | 32.9% | 36.2% |
| COGS Service | 0.4 | 0.3 | 0.78 | 0.91 | 0.87 | 1.24 | 1.80 | 2.10 | 2.60 | 3.18 | 3.60 | 4.45 |
| % service revs | 10.1% | 9.4% | 22.9% | 16.9% | 17.5% | 19.0% | 18.9% | 17.1% | 14.7% | 14.6% | 13.9% | 12.9% |
| Gross Profit | 2.1 | 2.6 | 2.7 | 2.7 | 4.1 | 5.3 | 7.7 | 10.2 | 18.0 | 18.6 | 24.4 | 30.1 |
| % margin | 84.9% | 90.9% | 77.4% | 64.4% | 82.9% | 61.0% | 81.1% | 82.9% | 85.3% | 86.4% | 86.0% | 87.1% |
| REVENUES | | | | | | | | | | | | |
| Net revenues | 16.5 | 19.2 | 24.8 | 36.1 | 41.5 | 46.6 | 52.5 | 58.8 | 67.9 | 75.7 | 85.7 | 95.5 |

| | |
|---|---|
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **InterTrust Technologies (ITRU)** |
| **Report Title** | Solid Quarter; Execution on Track; Announces Deal With Compaq! We Reiterate Strong Buy |
| **Author(s)** | Todd Raker, Brad Stephens |
| **Date of Statement** | May 2, 2000 |
| **Page Number** | 13 |
| **Fraudulent Statement** | Table 9<br>Projected Quarterly Income Statement, 1999–2000E<br>$ in millions, except per share data |

| (Fiscal Year Ends Dec.) | 1999E 3/31A | 6/30A | 9/30A | 12/31 | Full Year 1999E | 2000E 3/31A | 6/30 | 9/30 | 12/31 | Full Year 2000E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | |
| Licenses | $ 0.167 | $ 0.142 | $ 0.187 | $ 0.282 | $ 0.778 | $ 0.687 | $ 1.046 | $ 1.420 | $ 1.735 | $ 4.888 |
| % of Sales | 72.0% | 55.9% | 51.5% | 45.8% | 50.5% | 50.3% | 52.5% | 43.7% | 29.1% | 39.0% |
| Software Support Services | 0.065 | 0.112 | 0.176 | 0.410 | 0.763 | 0.660 | 0.946 | 1.264 | 1.416 | 4.286 |
| % of Sales | 28.0% | 44.1% | 48.5% | 54.2% | 49.5% | 49.7% | 47.5% | 38.9% | 23.8% | 34.2% |
| Transactions | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.565 | 2.801 | 3.367 |
| % of Sales | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 17.4% | 47.1% | 26.8% |
| Total Sales | 0.232 | 0.254 | 0.363 | 0.692 | 1.541 | 1.347 | 1.991 | 3.250 | 5.952 | 12.541 |

| | |
|---|---|
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Interwoven Inc (IWOV)** |
| **Report Title** | Q4:00—A Portrait of Perfection, Raising Estimates |
| **Author(s)** | Wendell H. Laidley, Marie A. Kluth, Brent Thill |
| **Date of Statement** | January 24, 2001 |
| **Page Number** | 6 |
| **Fraudulent Statement** | Table 1<br>Pro Forma Quarterly Income Statement, FY99A–01E<br>$ in thousands, except per share data |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Luminent Inc (LMNE)** |
| **Report Title** | Breaking the Bottleneck: A Wireline Weekly |
| **Author(s)** | James P. Parmelee, Monica M. Matyjaskiewicz, Gregory L. McNiff, Jon Mano |
| **Date of Statement** | June 29, 2001 |
| **Page Number** | 28 |
| **Fraudulent Statement** | Luminent (LMNE)<br>Historical and Projected Income Statement<br>($ in thousands; except per share data, fiscal year ends December) |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Lante Corporation (LNTE)** |
| **Report Title** | Mid-Quarter Update – Top-line Accelerating, Raising Estimates |
| **Author(s)** | Mark Wolfenberger, David Sturtz, Barry Chubrik |

| Date of Statement | June 8, 2000 |
|---|---|
| Page Number | 2 |
| Fraudulent Statement |  Lante Corporation |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| Issuer Name | VA Linux Systems (LNUX) |
| Report Title | Gaining Share in the Server World, VA is Now Expanding into Storage |
| Author(s) | Amit Chopra and Andrew McCullough |
| Date of Statement | September 12, 2000 |
| Page Number | 4 |
| Fraudulent Statement |  VA Linux Income Statement |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| Issuer Name | Lightspan Partnership Inc (LSPN) |
| Report Title | Shifting K-12 Internet Strategy from B2C to B2B; Goal is to Accelerate Path to Profitability. |
| Author(s) | Greg Cappelli, Michael Husman |
| Date of Statement | August 2, 2000 |
| Page Number | 4 |
| Fraudulent Statement |  Lightspan, Inc. |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| Issuer Name | McData Corporation (MCDT) |
| Report Title | A Chink in the Armor |
| Author(s) | Amit Chopra, Andrew McCullough, Daniel Lynch |

| Date of Statement | February 12, 2001 |
|---|---|
| Page Number | 4 |
| Fraudulent Statement | Exhibit 4<br>McDATA Quarterly Income Statement<br>$'s in thousands<br><br>

| | 1999A | Q1 00A | Q2 00A | Q3 00A | Q4 00A | 2000A | Q1 01E | Q2 01E | Q3 01E | Q4 01E | 2001E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 95,263 | $ 47,134 | $ 56,461 | $ 66,760 | $ 78,331 | $ 248,686 | $ 83,814 | $ 100,260 | $ 117,250 | $ 145,875 | $ 447,189 |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **MultiLink Technology (METC)** |
| Report Title | 3Q01 Earnings Preview |
| Author(s) | Charlie Glavin, Caroline Moon |
| Date of Statement | Oct. 9, 2001 |
| Page Number | 3 |
| Fraudulent Statement | Exhibit 1: MultiLink Technology Corp. Income Statement<br>US$ in millions, except per share data<br><br>

| | 2000 | | | | Year | 2001E | | | | Year | 2002E | | | | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $MM, except per share data | Q1<br>Mar-00 | Q1<br>Jun-00 | Q4<br>Sep-00 | Q4<br>Dec-00 | 2000 | Q1<br>Mar-01 | Q1<br>Jun-01 | Q3-01<br>Sep-01 | Q4E<br>Dec-01 | 2001E | Q1E<br>Mar-02 | Q2E<br>Jun-02 | Q3E<br>Sep-02 | Q4E<br>Dec-02 | 2002E |
| Net revenue | 12.3 | 16.3 | 18.7 | 25.4 | 72.7 | 31.1 | 35.1 | 37.6 | 40.2 | 144.0 | 44.5 | 49.1 | 54.0 | 59.4 | 207.0 |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **MP3.Com (MPPP)** |
| Report Title | Settlement with Sony Secured |
| Author(s) | Heath P. Terry |
| Date of Statement | August 22, 2000 |
| Page Number | 4 |
| Fraudulent Statement | MP3.com: Historical and Projected Income Statement<br>(in millions of $US, except per share data)<br>FY-DEC<br><br>

| | F1999A | | | | F2000E | | | | F2001E | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1QA | 2QA | 3QA | 4QA | 1QA | 2QA | 3QE | 4QE | 1QE | 2QE | 3QE | 4QE |
| Total Online Ad Revenue | 2.56 | 1.24 | 2.03 | 7.78 | 13.60 | 19.83 | 14.00 | 18.00 | 20.20 | 24.32 | 25.23 | 37.46 |
| % total | 44% | 65% | 50% | 51% | 78% | 78% | 61% | 64% | 62% | 63% | 52% | 65% |
| % growth | | | | | 232% | 1190% | 591% | 131% | 49% | 54% | 61% | 108% |
| E-commerce Revenue | 0.10 | 0.23 | 0.41 | 0.82 | 0.87 | 0.75 | 0.90 | 1.20 | 1.52 | 2.04 | 2.49 | 3.78 |
| % total | 15.5% | 12.3% | 12.0% | 4.1% | 3.7% | 3.7% | 3.5% | 4.5% | 4.8% | 5.3% | 5.8% | 6.5% |
| % growth | | | | | 946% | 185% | 97% | 84% | 130% | 171% | 211% | 213% |
| Total Offline Ad Rev/CD Sampl | 0.00 | 0.42 | 1.62 | 6.85 | 3.50 | 3.60 | 6.20 | 8.90 | 10.94 | 12.47 | 14.97 | 16.95 |
| % total | 0.0% | 22.2% | 40.0% | 44.9% | 18.9% | 17.4% | 35.7% | 31.7% | 33.4% | 32.1% | 35.0% | 28.6% |
| % growth | | | | | 745% | 406% | 30% | 231% | 246% | 83% | 86% |  |
| Total Groups Assault Reven | | | | 9.0 | 6.8 | 8.5 | 11.0 | 14.0 | 15.8 | 17.0 | 18.9 | 19.8 |
| TOTAL REVENUES | | | | | | | | | | | | |
| Net revenues | 0.68 | 1.91 | 4.05 | 15.27 | 17.60 | 20.18 | 23.00 | 28.10 | 32.73 | 38.83 | 42.74 | 57.77 |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Numerical Technologies (NMTC)** |
| Report Title | Growing through and beyond the downturn |
| Author(s) | John Pitzer, Randy Abrams, Brian Chin |
| Date of Statement | November 29, 2001 |
| Page Number | 2 |

| | |
|---|---|
| **Fraudulent Statement** | Exhibit 1: Numerical Income Statement<br>US$ in millions, unless otherwise stated<br><br>[income statement table — Total Revenue by quarter: Mar 00A 3.6, Jun 00A 4.7, Sep 00A 6.8, Dec 00A 8.5, FY00A 23.3, Mar 01A 10.3, Jun 01A 11.7, Sep 01A 12.8, Dec 01E 14.5, FY01E 49.3, Mar 02E 14.5, Jun 02E 16.0, Sep 02E 17.0, Dec 02E 18.5, FY02E 66.0] |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **New Focus, Inc (NUFO)** |
| **Report Title** | NUFO Delivers Blowout Q4:00 Results; Raising Estimates |
| **Author(s)** | James P. Parmelee, Leslie D. Mallon , Sarah K. Alford |
| **Date of Statement** | January 31, 2001 |
| **Page Number** | 6 |
| **Fraudulent Statement** | New Focus, Inc. (NUFO)<br>Historical and Projected Income Statement<br>($ in thousands, except per share data; fiscal year ends December 31st)<br><br>[Revenue by segment table covering 1999A, 2000A, 2001E quarters and Calendar Year; TOTAL REVENUE: 1Q A 4,741, 2Q A 4,581, 3Q A 6,675, 4Q A 6,845, 1Q A 9,702, 2Q A 14,651, 3Q A 22,280, 4Q A 33,875, 1Q E 44,600, 2Q E 61,800, 4Q E 75,100, F1999A 22,843, F2000A 80,598, F2001E 243,800, F2002E 345,700] |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Novatel Wireless (NVTL)** |
| **Report Title** | Q4:00 Blowout: 35% Upside to Top-line Estimates |
| **Author(s)** | Ray Sharma, Marc Cabi, Irving Ho |
| **Date of Statement** | February 7, 2001 |
| **Page Number** | 6 |
| **Fraudulent Statement** | Appendix Table 1<br>Novatel Wireless Income Statement<br>Millions of US$, Company Reports and CSFB Technology Group |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Onvia.com Inc (ONVI)** |
| **Report Title** | Q2 Results. |
| **Author(s)** | Christopher E. Vroom, CFA, John Torrey |
| **Date of Statement** | July 25, 2000 |
| **Page Number** | 4 |
| **Fraudulent Statement** | Onvia.com<br>Income Statement<br>($ in thousands, except per share)<br><br>[quarterly income statement table] |
| **Reason Why Fraudulent** | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **ONXY Software (ONXS)** |

Novatel Wireless Income Statement detail:

| | | Fiscal 2000A | | | Fiscal 2001E | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1/00A | Q2/00A | Q3/00A | Q4/00A | Q1/01 | Q2/01 | Q3/01 | Q4/01 | 1999A | 2000A | 2001E |
| Revenue | | 6.849 | 9.096 | 17.478 | 27.747 | 24.954 | 28.446 | 32.759 | 41.845 | 9.556 | 61.167 | 128.003 |

| Report Title | Q4 Ahead of Expectations |
|---|---|
| Author(s) | Brent Thill, John Torrey |
| Date of Statement | January 31, 2001 |
| Page Number | 6 |
| Fraudulent Statement | **ONYX Software, Inc.**<br>Income Statement<br>(data in thousands, except per share)<br><br>

**ONYX Software, Inc.** Income Statement (data in thousands, except per share)

| | Fiscal 2000 by Quarter | | | | Fiscal 2001E by Quarter | | | | Fiscal Year ends December | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1/00 | Q2/00 | Q3/00 | Q4/00 | Q1/01E | Q2/01E | Q3/01E | Q4/01E | 2000E | 2001E | 2002E |
| Revenues | $23,184 | $27,635 | $32,779 | $37,934 | $39,073 | $45,324 | $52,802 | $61,250 | $121,523 | $198,448 | $287,570 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|

| Issuer Name | **Razorfish, Inc. (RAZF)** |
|---|---|
| Report Title | Impact to Perception, No Impact to Fundamentals |
| Author(s) | Mark Wolfenberger, David Sturtz, Barry Chubrik, |
| Date of Statement | August 25, 2000 |
| Page Number | 3 |
| Fraudulent Statement |

| | FY98 | Q1-Mar Actual | Q2-Jun Actual | Q3-Sep Actual | Q4-Dec Actual | FY99 | Q1-Mar Actual | Q2-Jun Actual | Q3-Sep | Q4-Dec | FY00 | FY01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Project Sales | 101.9 | 32.6 | 40.0 | 44.9 | 52.7 | 170.2 | 64.1 | 76.6 | 80.5 | 88.0 | 309.2 | 445.0 |
| % ch Qtr-Qtr | | 20.8% | 22.7% | 12.1% | 17.5% | | 21.7% | 19.4% | 5.1% | 9.3% | | |
| Revenues | 101.9 | 32.6 | 40.0 | 44.9 | 52.7 | 170.2 | 64.1 | 76.6 | 80.5 | 88.0 | 309.2 | 445.0 |
| % ch. | | 467.9% | 12.5% | 47.8% | 86.5% | 94.3% | 68.5% | 96.6% | 91.9% | 70.5% | 67.0% | 81.7% | 23.9% |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|

| Issuer Name | **Retek (RETK)** |
|---|---|
| Report Title | Q4 Upside; Retail Spending Spree Continues |
| Author(s) | Brent Thill, Erik Swords |
| Date of Statement | January 23, 2001 |
| Page Number | 4 |
| Fraudulent Statement |

**Retek, Inc.** Income Statement (data in thousands, except per share)

| | — FY2000 by Quarter — | | | | — FY2001E by Quarter — | | | | — Year Ended December — | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar 00 | Jun 00 | Sep 00 | Dec 00 | Mar 01E | Jun 01E | Sep 01E | Dec 01E | 2000 | 2001E | 2002E |
| License revenue | 6,430 | 11,508 | 17,291 | 22,500 | 25,705 | 29,792 | 34,733 | 40,487 | 57,729 | 130,717 | 205,373 |
| Service revenue | 7,534 | 8,081 | 9,071 | 9,542 | 11,306 | 11,300 | 12,523 | 13,606 | 34,228 | 49,185 | 68,458 |
| Total revenue | $13,964 | $19,589 | $26,362 | $32,042 | $35,951 | $41,092 | $47,256 | $54,344 | $91,957 | $179,902 | 273,830 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|

| Issuer Name | **ScreamingMedia Inc. (SCRM)** |
|---|---|
| Report Title | Internet Infrastructure Earnings Preview |
| Author(s) | Todd Raker, Suji DeSilva, Johnathan Feeney, Kristen Bartholdson |
| Date of Statement | January 16, 2001 |
| Page Number | None listed, but approx. 17 of 29 pages |

| Fraudulent Statement | **ScreamingMedia, Inc. — Projected Quarterly Income Statement 1999-2001** |
|---|---|

| | | Full Year 1999A | 3/31A | 6/30A | 9/30A | 12/31E | Full Year 2000E | 3/31E | 6/30E | 9/30E | 12/31E | Full Year 2001E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Fiscal Year Ends Dec)* | | | | **2000E** | | | | | **2001E** | | | |
| **Revenues** | | | | | | | | | | | | |
| Net Content Revenues | | 2,480 | 2,231 | 4,037 | 5,506 | 6,498 | 18,272 | 7,844 | 9,787 | 11,953 | 15,040 | 44,624 |
| % of Sales | | 83.1% | 82.0% | 85.8% | 83.8% | 85.2% | 84.4% | 85.6% | 87.8% | 87.3% | 88.4% | 87.5% |
| License Fees | | 0.505 | 0.489 | 0.667 | 1.078 | 1.132 | 3.366 | 1.319 | 1.363 | 1.741 | 1.980 | 6.403 |
| % of Sales | | 16.9% | 18.0% | 14.2% | 16.4% | 14.8% | 15.6% | 14.4% | 12.2% | 12.7% | 11.6% | 12.5% |
| **Total Net Revenue** | | **2.985** | **2.720** | **4.704** | **6.584** | **7.630** | **21.638** | **9.163** | **11.150** | **13.694** | **17.020** | **51.027** |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Silicon Image (SIMG)** |
| **Report Title** | SIMG Earnings Preview |
| **Author(s)** | Charlie Glavin, CFA, Regina Eberhart, Caroline Moon |
| **Date of Statement** | October 02, 2000 |
| **Page Number** | 4 |

| Fraudulent Statement | Table 1 Income Statement |
|---|---|

| | | | | **1999** | | | | **2000** | | | | **2001** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ MM) | | Q1 Mar-99 | Q2 Jun-99 | Q3 Sep-99 | Q4 Dec-99 | FYE Dec-99 | Q1 Mar-00 | Q2 Jun-00 | Q3E Sep-00 | Q4E Dec-00 | FYE Dec-00 | Q1E Mar-01 | Q2E Jun-01 | Q3E Sep-01 | Q4E Dec-01 | FYE Dec-01 |
| Net revenues | | $4.1 | $4.2 | $5.3 | $7.6 | $21.2 | $18.1 | $14.6 | $17.2 | $44.3 | $19.8 | $22.6 | $25.7 | $29.9 | $98.0 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Selectica (SLTC)** |
| **Report Title** | Mid Quarter Update |
| **Author(s)** | Brent Thill |
| **Date of Statement** | November 13, 2000 |
| **Page Number** | 5 |

| Fraudulent Statement | Selectica, Inc. Income Statement *(data in thousands, except per share)* |
|---|---|

| | | Fiscal 2000 by Quarter | | | | Fiscal 2001 by Quarter | | | | Fiscal 2002 by Quarter | | | | Fiscal Year ends March | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1Q-00 | 2Q-00 | 3Q-00 | 4Q-00 | 1Q-01 | 2Q-01 | 3Q-01E | 4Q-01E | 1Q-02E | 2Q-02E | 3Q-02E | 4Q-02E | FY00 | FY01E | FY02E |
| Revenues | | $1,201 | $2,634 | $4,565 | $7,110 | $10,842 | $14,815 | $20,311 | $26,213 | $29,164 | $32,794 | $39,899 | $43,989 | $2,444 | $16,258 | $71,982 $146,353 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Simplex Solutions (SPLX)** |
| **Report Title** | Initiating Coverage with Buy and $30 Target |
| **Author(s)** | Erach D. Desai, Andrew J. Singer, CFA |
| **Date of Statement** | May 29, 2001 |
| **Page Number** | 6-7 |
| **Fraudulent Statement** | We are establishing the following estimates (FY-End = September):<br>• FY01E: Revenues of $47.8mm (+54%), cash net income of $1.6mm and EPS of $0.09<br>• FY02E: Revenues of $67.0mm (+40%), cash net income of $7.6mm and EPS of $0.36<br>• FY03E: Revenues of $88.0mm (+31%), cash net income of $13.7mm, EPS of $0.57<br>On a calendar year basis:<br>• CY01E: Revenues of $53.2mm with EPS of $0.13<br>• CY02E: Revenues of $72.0mm with EPS of $0.44<br>• CY03E: Revenues of $93.0mm with EPS of $0.57 |

| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
|---|---|
| **Issuer Name** | **Support.com, Inc. (SPRT)** |
| Report Title | Another Upside Quarter, Raising Estimates and Upgrading to Strong Buy |
| Author(s) | Wendell H. Laidley, Marie A. Kluth |
| Date of Statement | January 18, 2001 |
| Page Number | 7 |
| Fraudulent Statement | Exhibit 3<br>Support.com, Inc.<br>Income Statement<br>$ in thousands, except per-share data |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Tanning Technology Corp. (TANN)** |
| Report Title | Update on Quarterly Progress |
| Author(s) | Mark Wolfenberger, David Sturtz and Barry Chubrik |
| Date of Statement | June 7, 2000 |
| Page Number | 1 |
| Fraudulent Statement | TANN Earnings Model FY98A-FY01E<br>$ in millions, except per share data<br><br>Tanning Technology Corp. (TANN)<br>FY Ends Dec<br>BUY / $40<br>4/25/00 |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Tickets.com (TIXX)** |
| Report Title | Strong Online Ticketing Revenues Highlight Q1 |
| Author(s) | Bob Hiler and Daniel Lynch |
| Date of Statement | May 16, 2000 |
| Page Number | 7 |
| Fraudulent Statement | Quarterly Income Statement<br>$ in millions, except per share data |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Tumbleweed Communications Corp. (TMWD)** |
| Report Title | Closes Interface Acquisition. Revises Guidance for Acquisition. |
| Author(s) | Todd Raker |

| Date of Statement | September 18, 2000 |
|---|---|
| Page Number | 5 |
| Fraudulent Statement | **Table 4**<br>**Projected Quarterly Income Statement, 1999A–2000E**<br>$ in millions, except per share data<br> |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Triton Network Systems (TNSI)** |
| Report Title | Revenues Increases by 54% Sequentially |
| Author(s) | Marc A. Cabi, Randy Abrams, Tim Long |
| Date of Statement | October 25 2000 |
| Page Number | 5 |
| Fraudulent Statement | **Exhibit 3**<br>**Triton Quarterly Statement Analysis**<br>$ in thousands, except per share data<br> |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Viant Corporation (VIAN)** |
| Report Title | Analyst Day Unleashes Loudcloud Alliance |
| Author(s) | Mark Wolfenberger, David Sturtz, Barry Chubrik |
| Date of Statement | August 9, 2000 |
| Page Number | 3 |
| Fraudulent Statement | **Viant Earnings Model 1998A-2001E**<br>**In millions, except per share**<br> |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| **Issuer Name** | **Vitria Technology (VITR)** |
| Report Title | New Customers Highlight Upside Quarter, Raising Estimates, Compelling Entry Point |
| Author(s) | Wendell H. Laidley and Marie A. Kluth |

| Date of Statement | October 20, 2000 |
|---|---|
| Page Number | 6 |
| Fraudulent Statement | **Pro Forma Income Statement** $ in thousands, except per share data |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| Issuer Name | **Virata Corporation (VRTA)** |
| Report Title | VRTA: Quarter Preview |
| Author(s) | Charlie Glavin, Regina Eberhart, Caroline Moon |
| Date of Statement | October 3, 2000 |
| Page Number | 3 |
| Fraudulent Statement | Income Statement |
| Reason Why Fraudulent | >Tried to create an appearance of unpredictable revenue growth. |
| Issuer Name | |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____

|  |  |
|---|---|
| AMY LIU on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>CREDIT SUISSE FIRST BOSTON CORPORATION, CREDIT SUISSE FIRST BOSTON, INCORPORATED, CREDIT SUISSE FIRST BOSTON-USA, CREDIT SUISSE FIRST BOSTON, CREDIT SUISSE GROUP, FRANK QUATTRONE, GEORGE BOUTROS, WILLIAM BRADY, JOHN M. HENNESSY, ALLEN D. WHEAT, RICHARD THORNBURGH, CHARLES WARD, DAVID A. DENUNZIO, EDWARD NADEL, JOHN HODGE, JACK TEJAVANIJA, AIRSPAN NETWORKS, INC., ERIC D. STONESTROM, JOSEPH J. CAFFARELLI, AT ROAD, INC., KRISH PANU, THOMAS C. HOSTER, OCCAM NETWORKS INC. (formerly "ACCELERATED NETWORKS, INC.") , SURESH NIHALANI, FREDERIC T. BOYER, AVANTGO, INC., RICHARD OWEN, DAVID B. COOPER, JR., AUTOWEB.COM, INC. (AUTOBYTEL, real party in interest), DEAN A. DEBIASE, SAMUEL M. HEDGPETH III, BSQUARE CORP., WILLIAM T. BAXTER, BRIAN V. TURNER, BLUE COAT SYSTEMS, INC. (formerly "CACHEFLOW, INC."), BRIAN M. NESMITH, MICHAEL J. JOHNSON, CLARENT CORP. (VERSO TECHNOLOGIES, INC., real party in interest), JERRY SHAW-YAU CHANG, RICHARD J. HEAPS, COMMERCE ONE, INC., MARK B. HOFFMAN, PETER F. PERVERE, CORILLIAN CORP., TED F. SPOONER, STEVEN SIPOWICZ, CENTILLIUM COMMUNICATIONS, INC., FARAJ AALAEI, JOHN W. LUHTALA, DIGITAL IMPACT, INC., WILLIAM C. PARK, DAVID OPPENHEIMER, E MACHINES, INC., STEPHEN A. DUKKER, STEVEN H. MILLER, | CERTIFICATION OF CLASS REPRESENTATIVE REGARDING THE FILING OF A CLASS ACTION COMPLAINT |

EFFICIENT NETWORKS, INC., MARK A.                )
FLOYD, JILL S. MANNING, E.PIPHANY, INC.,         )
ROGER S. SIBONI, KEVIN J. YEAMAN, EVOLVE         )
SOFTWARE, INC., JOHN P. BANTLEMAN,               )
DOUGLAS S. SINCLAIR, HANDSPRING, INC.,           )
DONNA L. DUBINSKY, BERNARD J. WHITNEY,           )
IMPROVENET, INC., RONALD B. COOPER,              )
RICHARD G. REECE, INTERNAP NETWORK               )
SERVICES CORP., ANTHONY C. NAUGHTIN,             )
PAUL E. MCBRIDE, INFORMATICA CORP.,              )
GAURAV S. DHILLON, CRAIG L.                      )
KLOSTERMAN, IPRINT TECHNOLOGIES, INC.            )
(formerly "IPRINT.COM"; MADETOORDER.COM,         )
INC., real party in interest), ROYAL P. FARROS,  )
JAMES P. MCCORMICK, INTRAWARE, INC.,             )
PETER H. JACKSON, DONALD M. FREED,               )
INTERTRUST TECHNOLOGIES CORP., VICTOR            )
SHEAR, ERWIN N. LENOWITZ, INTERWOVEN,            )
INC., MARTIN BRAUNS, DAVID M. ALLEN,             )
LUMINENT, INC., WILLIAM R. SPIVEY, ERIC          )
BLACHNO, LANTE CORP. (SBI AND                    )
COMPANY, real party in interest), C. RUDY        )
PURYEAR, BRIAN HENRY, VA SOFTWARE                )
CORPORATION (formerly "VA LINUX                  )
SYSTEMS"), LARRY M. AUGUSTIN, TODD B.            )
SCHULL, LIGHTSPAN PARTNERSHIP, INC.,             )
JOHN T. KERNAN, KATHLEEN R. MCELWEE,             )
MCDATA CORPORATION, JOHN F.                      )
MCDONNELL, DEE J. PERRY, MULTILINK               )
TECHNOLOGY CORP., RICHARD N.                     )
NOTTENBURG, ERIC M. PILLMORE, MP3.COM            )
(VIVENDI UNIVERSAL NET USA GROUP, INC.,          )
real party in interest), MICHAEL L. ROBERTSON,   )
PAUL L. H. OUYANG, NUMERICAL                     )
TECHNOLOGIES, INC., Y. C. (BUNO) PATI,           )
RICHARD MORA, NEW FOCUS, INC., KENNETH           )
E. WESTRICK, WILLIAM L. POTTS, JR.,              )
NOVATEL WIRELESS, INC., JOHN MAJOR,              )
MELVIN FLOWERS, ONVIA.COM, INC., GLENN           )
S. BALLMAN, MARK T. CALVERT, ONYX                )
SOFTWARE CORP., BRENT R. FREI, SARWAT            )
H. RAMADAN, RAZORFISH, INC. (SBI AND             )
COMPANY, real party in interest), JEFFREY A.     )
DACHIS, SUSAN BLACK, RETEK, INC., JOHN           )
BUCHANAN, GREGORY A. EFFERTZ,                    )
PINNACOR, INC. (formerly "SCREAMINGMEDIA,        )

INC.")., KEVIN C. CLARK, DAVID M. OBSTLER,         )
SILICON IMAGE, INC., DAVID D. LEE, DANIEL          )
K. ATLER, SELECTICA, INC., RAJEN JASWA,            )
STEPHEN BENNION, SIMPLEX SOLUTIONS,                )
INC. (CADENCE DESIGN SYSTEMS, INC., real           )
party in interest), PENELOPE A. HERSCHER, LUIS     )
P. BUHLER, SUPPORTSOFT, INC. (formerly             )
"SUPPORT.COM"), RADHA R. BASU, BRIAN M.            )
BEATTIE, TANNING TECHNOLOGY CORP.,                 )
LARRY G. TANNING, HENRY F. SKELSEY,                )
TICKETS.COM, INC., W. THOMAS GIMPLE,               )
JOHN M. MARKOVICH, TUMBLEWEED                      )
COMMUNICATIONS CORP., JEFFREY C. SMITH,            )
JOSEPH C. CONSUL, TRITON NETWORK                   )
SYSTEMS, INC., HOWARD SPEAKS, KENNETH              )
R. VINES, VIANT CORP. (DIVINE, INC., real party    )
in interest), ROBERT L. GETT, M. DWAYNE            )
NESMITH, VITRIA TECHNOLOGY, INC., JOMEI            )
CHANG, PAUL AUVIL, GLOBESPANVIRATA,                )
INC. (formerly "VIRATA CORP."), CHARLES            )
COTTON, ANDRE VOUGHT,                              )
                                                   )
        Defendants.                                )
                                                   )
_____    )

I, Amy Liu, hereby certify that:

   (a) I have reviewed the complaint prepared by counsel in the above referenced case, and

       have authorized its filing;

   (b) I did not purchase the shares of Commerce One common stock at the direction of

       plaintiff's counsel or in order to participate in any private action arising under the federal

       securities laws.

   (c) I am willing to serve as a representative party on behalf of a class, including providing

       testimony at deposition and trial if necessary

   (d) During the proposed class period, my deceased husband, Peter Lin, using community

       property, executed the following transactions related to Commerce One common stock:

| Date | Action | Amount | Price |
|---|---|---|---|
| July 18, 2000 | Bought | 200 | 66.1875 |
| January 19, 2001 | Bought | 300 | 28.0000 |
| January 24, 2001 | Sold | 300 | 34.8125 |
| January 26, 2001 | Bought | 200 | 32.3125 |
| February 5, 2001 | Sold | 200 | 28.7500 |
| March 1, 2001 | Sold | 60 | 17.1250 |
| April 19, 2001 | Bought | 100 | 13.0700 |
| April 27, 2001 | Sold | 130 | 9.5600 |
| May 22, 2001 | Bought | 90 | 9.2600 |
| May 30, 2001 | Short Sale | 400 | 6.7500 |
| June 8, 2001 | Cover Short | 400 | 6.2300 |
| June 28, 2001 | Bought | 500 | 4.0900 |
| June 28, 2001 | Bought | 300 | 4.0900 |
| July 2, 2001 | Sold | 500 | 5.2500 |
| July 2, 2001 | Sold | 500 | 5.2500 |
| July 12, 2001 | Bought | 500 | 5.2500 |
| July 12, 2001 | Bought | 500 | 5.2500 |
| July 20, 2001 | Sold | 200 | 3.8500 |
| July 20, 2001 | Sold | 800 | 3.8500 |

(e) I have not acted as a class representative in any cases brought under the federal securities laws during the past three years.

(f) I will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiffs' pro-rata share of any recovery, except as ordered or approved by the court.

SWORN AND CERTIFIED THIS 27 DAY OF Feb, 2003.

Amy Liu

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

AMY LIU on behalf of herself and all others similarly situated,

**DEFENDANTS**

CREDIT SUISSE FIRST BOSTON CORPORATION et al.

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Charles Jung, Esq.
Claudio Riedi, Esq.
7700 N. Kendall Dr., Ste 303, Miami, Florida  33156  (305)

Attorneys (If Known)

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | Injury | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | or Defendant) | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN**  (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**  (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

15 USC §.78aa; 15USC §. 77; 17 CFR §. 240.10b-5 ; 15 USC §. 771(a)(2)
and 15 USC §. 770

**VII. REQUESTED IN COMPLAINT:**  ☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  2/28/03

SIGNATURE OF ATTORNEY OF RECORD

Fla. Bar # 984930

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

$150.00  878075
02/28/03